Rachel KNOWLES, et al.,

v.

STATE of Tennessee.

Court of Appeals of Tennessee,
Eastern Section, at Knoxville.

Feb. 27, 2001.

Paul G. Summers, Attorney General & Reporter; Laura T. Kidwell, Assistant Attorney General, for appellant State of Tennessee.

Billy J. Stokes, Knoxville, TN, for appellees Rachel Knowles and William Knowles.

R. Christopher Gilreath, Knoxville, TN, for appellees John Stephen Snapp and Roger Wayne Snapp.

**OPINION**

SUSANO, J., delivered the opinion of the court, in which GODDARD, P.J., and FRANKS, J., joined.

This appeal focuses on two consolidated cases involving claims against the State of Tennessee arising out of an accident involving two automobiles and a piece of grass mowing equipment owned by the

State. An employee of the State was mowing the grassy median on Alcoa Highway in Knoxville when his mower was struck by a vehicle driven by John P. Snapp. Snapp's vehicle then crossed the median and struck a vehicle driven by Rachel Knowles. Snapp was killed, and Mrs. Knowles was seriously injured. Snapp's sons, John Stephen Snapp and Roger Wayne Snapp, filed a claim against the State, as did Mrs. Knowles and her husband, William Knowles. The two claims against the State were transferred by a Claims Commissioner to the Blount County Circuit Court for trial pursuant to the provisions of T.C.A. § 9–8–404 (1999). In court, the claims were consolidated with an action filed by the Knowles against the administrator of Snapp's estate. At the conclusion of the trial, the court awarded judgments against the State as follows: $300,000 to Mrs. Knowles, $100,000 to William Knowles, and $300,000 in the Snapp wrongful death case. The State appeals, arguing (1) that the trial court erred in finding the State negligent; (2) that the trial court erred in its allocation of fault; and (3) that the awards are excessive. The plaintiffs assert that the appeal is frivolous. We affirm, but do not find the appeal to be frivolous.

I.

The subject accident occurred May 12, 1997, on Alcoa Highway in Knoxville. At the accident site, Alcoa Highway is a four-lane divided highway with the northbound and southbound lanes separated by a grassy median. At the time of the accident, John Crowder, a Tennessee Department of Transportation employee, was mowing the median. Crowder was driving a tractor and pulling a flat mowing apparatus known as a bushhog. According to Crowder, the bushhog is "a little bit" wider than the tractor. Crowder was driving the tractor

southbound at the west edge of the northbound lanes of the highway.

Maria Correll was proceeding north in the left, inside lane of the highway, on her way to work. John P. Snapp was driving his vehicle to the rear of the Correll vehicle, also proceeding north in the left, inside lane of the highway. Correll testified at trial that she had just passed several slower cars in the right hand lane when she noticed the bushhog protruding a foot to two feet out from the grassy median into her lane of travel. Correll swerved to her right and immediately looked into her rearview mirror in time to see Snapp's vehicle strike the bushhog. Correll testified that Snapp's vehicle then crossed the median and struck a vehicle driven by Rachel Knowles, who was proceeding in the southbound portion of the highway. As a result of the accident, Snapp died without regaining consciousness. Mrs. Knowles was seriously injured. The accident gave rise to three separate claims/suits. The two claims at issue on this appeal are those brought against the State by Mr. and Mrs. Knowles and Snapp's next of kin.

At trial, Correll testified that she was driving between 50 and 55 miles per hour, within the speed limit, and that traffic was heavy. She said that when she encountered the mower, the tractor itself was not in the road, but that the bushhog was protruding into her lane of travel. Upon noticing this fact, she swerved into the right-hand lane. Until she swerved, her car had blocked the decedent's view of the bushhog. She also testified that, upon looking into her rearview mirror immediately after swerving to miss the bushhog, she observed the decedent, who was properly in his lane of travel three to four car lengths behind her, strike the bushhog. She testified that the decedent could not

have swerved to the right as she had done because there were cars to his right.

This view of the facts was corroborated by Byran Tankersley. Tankersley was just north of the accident site, awaiting an opportunity to turn northbound onto Alcoa Highway. Prior to the accident, Tankersley was having difficulty turning onto the highway because several cars were swerving into the right-hand lane to miss the mower, which, according to him, was "actually across the line a little bit into traffic." He looked up at the tractor at or about the time the decedent's vehicle struck the bushhog.

Crowder's testimony at trial is somewhat confusing. At one point, he stated affirmatively that the mower was not in the road. He also stated that he was "looking all around," including in the direction of oncoming traffic. Crowder stated repeatedly, however, that he did not know how the accident happened and that he did not see the decedent's car before it hit the bushhog. Crowder stated that after the decedent's vehicle hit his mower, he looked down to find his tire had gone flat. He testified that the tire was on the median-side of the yellow line, and that he backed up because the tractor was leaning, and its canopy was hanging over into the roadway. The testimony showed that, although at least one sign was placed along the road to warn motorists that work was being done in the area, no warning cones, flagmen, or flashing arrows were used to warn motorists.

The trial court found the State 100% at fault[1] and awarded $300,000 to Mrs. Knowles, $100,000 to her husband, and $300,000 to the decedent's sons. The

State appeals, arguing (1) that the trial court erred in finding the State negligent; (2) that the trial court erred in its allocation of fault; and (3) that the awards are excessive. The plaintiffs assert that the appeal is frivolous.

## II.

In this non-jury case, our review is *de novo* upon the record, with a presumption of correctness as to the trial court's factual determinations, unless the evidence preponderates otherwise. Tenn. R .App.P. 13(d); *Wright v. City of Knoxville,* 898 S.W.2d 177, 181 (Tenn.1995); *Union Carbide Corp. v. Huddleston,* 854 S.W.2d 87, 91 (Tenn.1993). The trial court's conclusions of law, however, are accorded no such presumption. *Campbell v. Florida Steel Corp.,* 919 S.W.2d 26, 35 (Tenn.1996); *Presley v. Bennett,* 860 S.W.2d 857, 859 (Tenn.1993).

## III.

### A.

To prevail on a negligence claim, a plaintiff must establish the following elements: "(1) a duty of care owed by defendant to plaintiff; (2) conduct below the applicable standard of care that amounts to a breach of that duty; (3) an injury or loss; (4) cause in fact; and (5) proximate, or legal, cause." *McCall v. Wilder,* 913 S.W.2d 150, 153 (Tenn.1995). The State's first argument concerns the first two of these elements.

The presence or absence of a duty owed to the plaintiff "is entirely a question of law to be determined by reference to the body of statutes, rules, principles and

---

1. Interestingly enough, the jury that heard the Knowles' lawsuit against the Snapp estate also determined that the State was 100% at fault. The jury considered the action against the estate in the same courtroom and at the

same time the trial court was considering the claims against the State. The jury's verdict was announced following the trial court's pronouncement of the same allocation of fault. The jury's verdict was not appealed.

precedents which make up the law; and it must be determined only by the court...." *Bradshaw v. Daniel,* 854 S.W.2d 865, 870 (Tenn.1993). According to T.C.A. § 55–8–125 (1998), "[w]henever any highway has been divided into two (2) roadways by leaving an intervening space or by a physical barrier or clearly indicated dividing section so constructed as to impede vehicular traffic, every vehicle shall be driven only upon the right-hand roadway...." The term "highway" refers to "the entire width between the boundary lines of every way when any part thereto is open to the use of the public for purposes of vehicular travel." T.C.A. § 55–8–101(22) (Supp.2000). A "roadway" is "that portion of a highway improved, designed or ordinarily used for vehicular travel, exclusive of the berm or shoulder." T.C.A. § 55–8–101(50) (Supp.2000). A "vehicle" is "every device in, upon or by which any person or property is or may be transported or drawn upon a highway, excepting devices used exclusively upon stationary rails or tracks." T.C.A. § 55–8–101(72) (Supp.2000).

■ With respect to the applicable standard of care, the State's first argument is premised upon its perception that the plaintiffs' proof, as well as the trial court's findings, hinged upon the standard of care as articulated in the Department of Transportation's Manual on Uniform Traffic Control Devices ("the Manual"). The State argues that the plaintiffs failed to prove a breach of the standard of care (1) because the Manual's mowing standards were not admitted into evidence; (2) because such standards were not testified to by a competent witness; and (3) because the Manual, to the extent it required warning cones, lane closures, and flagmen, only applies once a decision to utilize such traffic control devices is made and does not

apply to the actual decision as to whether to utilize them.

We find the State's focus on the Manual to be misplaced. In their complaint, the Knowles' allege that a portion of the mower, which was proceeding southward in the median facing northbound traffic, protruded into the northbound lane of the highway, causing the initial impact. Although the complaint contains no specific reference to any statute, the State did not request a more precise allegation. While a portion of the proof dealt with the presence, absence, or sufficiency of signs, cones, flagmen, or lane closures, *i.e.,* compliance with the Manual, much of the proof also concerned the question of whether a portion of the tractor or bushhog was traveling in the wrong direction on the roadway. With respect to this question, we find the applicable standard of care to be that found in the rules of the road, specifically, T.C.A. § 55–8–125, which provides that vehicles are only to be driven on the right-hand side of divided highways. The evidence clearly indicates that a portion of the vehicle, *i.e.,* the mower, was protruding into the roadway and that it was traveling against traffic. We therefore find and hold that the trial court did not err in finding that the State "was negligent to have the mowing machine or any part of it out in the lane of travel."

### B.

The State next argues that the trial court erred in its allocation of fault. The State asserts that, given the trial court's finding that motorists were warned of the mowing project, it was error to not allocate any fault to Snapp. More specifically, the State asserts that the decedent breached a heightened duty to use reasonable care because (1) he had reason to know he was driving through a work zone; (2) he was following too closely; and (3) he was driv-

ing at an unsafe speed. In support of this argument, the State cites *Ledford v. Southeastern Motor Truck Lines,* 29 Tenn. App. 675, 682, 200 S.W.2d 981, 984 (1946) (a motorist who is aware that he or she is driving through a work zone is required to take this fact into consideration in using reasonable care); *Russell v. Furniture Renewal, Inc.,* 177 Tenn. 525, 531, 151 S.W.2d 1066, 1068 (1941) (a motorist has a duty to stay a safe distance behind the vehicles he or she is following); and *Coleman v. Byrnes,* 34 Tenn.App. 680, 690, 242 S.W.2d 85, 89 (1950) (a motorist may be found guilty of negligence based on driving at an unsafe speed even if he or she is not violating the speed limit).

■ After careful review of the record, we cannot say that the evidence preponderates against the trial court's finding that Snapp was in no way at fault. Correll testified that she had to swerve to miss the bushhog and that her car was blocking Snapp's view of the hazard. There is no evidence indicating that it was necessary for Snapp to reduce his speed or to allow more room between his vehicle and Correll's vehicle. We therefore hold that the trial court's finding that the State had posted signs indicating that work was being done in the area does not preclude a finding that Snapp was in no way at fault for the accident.

The State also argues that the trial court's allocation of fault is erroneous (1) because the trial court should not have relied on the sudden emergency doctrine, and (2) even if the doctrine is still viable, it was error to use it in this case where, so the argument goes, Snapp contributed to the emergency.

■ The sudden emergency doctrine "recognizes that a person confronted with a sudden or unexpected emergency which calls for immediate action is not expected to exercise the same accuracy of judgment as one acting under normal circumstances who has time for reflection and thought before acting." *McCall v. Wilder,* 913 S.W.2d 150, 157 (Tenn.1995). Since the adoption of comparative fault in Tennessee, *see McIntyre v. Balentine,* 833 S.W.2d 52 (Tenn.1992), "[t]he doctrine no longer constitutes a defense as a matter of law but, if at issue, must be considered as a factor in the total comparative fault analysis." *McCall,* 913 S.W.2d at 157. One who has contributed to the creation of the alleged emergency cannot rely on the sudden emergency doctrine. *Kowalski v. Eldridge,* 765 S.W.2d 746, 749 (Tenn.Ct.App. 1988).

■ We find no error in the trial court's application of the sudden emergency doctrine. It is true that the trial court found that the decedent was presented with a sudden emergency and concluded that the State was 100% at fault and that Snapp was not guilty of any negligence/fault. It does not necessarily follow, however, that the court considered the sudden emergency doctrine as an absolute bar to a finding of negligence/fault on the part of Snapp. We find no indication that the doctrine was misapplied by the trial court, nor can we say that the evidence preponderates against the trial court's conclusion that the decedent did not contribute to the emergency. Accordingly, we find no error in the trial court's allocation of fault. While not controlling, we also find interesting the fact that the jury in the case of Mr. and Mrs. Knowles versus the Snapp estate, acting independent of the trial court's earlier-announced decision, also concluded that the State was 100% at fault.

### C.

The State next contends that the awards of $300,000 to Mrs. Knowles and $100,000

to Mr. Knowles were excessive. We disagree.

As the amount of personal injury awards are primarily for the factfinder to determine, *see Brown v. Null,* 863 S.W.2d 425, 430 (Tenn.Ct.App.1993), we cannot say that the evidence preponderates against the amounts of the Knowles' awards. Mrs. Knowles was admitted to the hospital on May 12, 1997. According to her treating physician, "she had sustained a high-force energy or trauma from a car accident and had an obvious open fracture of the right foot, a fracture of the right ankle, a very extensive deep laceration to the left elbow region and a fractured left hand fifth metacarpal." She underwent surgery twice before she was discharged on May 19, 1997. She also had to endure, both during her hospital stay and after discharge as an outpatient, multiple sessions of irrigation and debridement, a procedure during which she was placed in a whirlpool so that her heel wound could be cleaned and the bone fragments removed. In addition, the accident aggravated a pre-existing neck problem.

Even upon returning home, Mrs. Knowles, with injuries to two of her four extremities rendering her completely immobile, required full assistance with daily activities. Her treatment continued for approximately a year, and, according to her doctor, she did not reach maximum medical improvement until approximately April 19, 1999. Her right, lower extremity was 50% permanently impaired. This converted to a 20% whole-person impairment rating. While there was no permanent impairment to her elbow or hand, she did have permanent scars in those areas. As a result of her injuries, Mrs. Knowles is unable to participate in many of the hobbies she used to enjoy, both by herself and with her husband. She also gets depressed frequently, and she is nervous when driving. Her medical bills totaled approximately $50,000.

As for Mr. Knowles, he had to assist Mrs. Knowles with intensely personal activities for two to three months following the accident. Mr. Knowles also had to learn how to keep the house and do the laundry. He transported Mrs. Knowles to her frequent treatments and follow-up medical appointments. Mr. Knowles testified that Mrs. Knowles was depressed and moody throughout the rehabilitation period, and that, though they used to share the same bedroom, that had "changed . . . [f]or the worse." In addition, Mr. Knowles testified that the fair market value of the car that had been completely destroyed in the accident was between $22,000 and $23,000.

In view of this testimony, we find and hold that the evidence does not preponderate against the trial court's award of $300,000 to Mrs. Knowles and $100,000 to Mr. Knowles. We accordingly affirm the trial court on this point.

## D.

Finally, the State argues that the award of $300,000 in the Snapp wrongful death case is excessive. Again, we disagree.

A plaintiff in a wrongful death action is entitled to recover for the following damages:

> the mental and physical suffering, loss of time, and necessary expenses resulting to the deceased from the personal injuries, and also the damages resulting to the parties for whose use and benefit the right of action survives from the death consequent upon the injuries received.

T.C.A. § 20–5–113 (1994). This statute identifies two categories of damages. *Jordan v. Baptist Three Rivers Hosp.,* 984 S.W.2d 593, 600 (Tenn.1999). "The first classification permits recovery for injuries sustained by the deceased from the time of

injury to the time of death," and includes "medical expenses, physical and mental pain and suffering, funeral expenses, lost wages, and loss of earning capacity." *Id.* With respect to this first classification of damages, a wrongful death plaintiff may not recover damages for pain and suffering absent proof of conscious injury. *See Hutton v. City of Savannah,* 968 S.W.2d 808, 811 (Tenn.Ct.App.1997); *see also McClanahan v. Clayton,* C/A No. 01A01–9308–CV–00371, 1994 WL 248183, at \*3 (Tenn. Ct.App. M.S., filed June 10, 1994).

 "The second classification of damages permits recovery of incidental damages suffered by the decedent's next of kin." *Jordan,* 984 S.W.2d at 600. Incidental damages include the pecuniary value of the decedent's life at the time of his or her death. *Id.; Phelps v. Magnavox Co.,* 497 S.W.2d 898, 902 (Tenn.Ct.App. 1972). Factors to consider in determining the pecuniary value of the decedent's life include "the expectancy of life, the age, condition of health and strength, capacity for labor and earning money through skill, any art, trade, profession and occupation or business, and personal habits as to sobriety and industry." *Jordan,* 984 S.W.2d at 600. Additionally, courts are to account for the decedent's probable living expenses had the decedent lived. *Id.*

 The *Jordan* case, for the first time, interpreted the term "pecuniary value" to include consortium damages. *See Jordan,* 984 S.W.2d at 601. This expansion of the term "applies retroactively to: (1) all cases tried or retried after the date of [the Supreme Court's] decision in *Jordan;* and (2) to all cases pending on appeal in which the issue decided in *Jordan* was raised at an appropriate time." *Hill v. City of Germantown,* 31 S.W.3d 234, 240 (Tenn.2000). "Loss of consortium consists of several elements, encompassing not only tangible services provided by a family member, but also intangible benefits each family member receives from the continued existence of other family members. Such benefits include attention, guidance, care, protection, training, companionship, cooperation, affection, [and] love...." *Jordan,* 984 S.W.2d at 602. While a child's age does not, by itself, preclude that child from being entitled to parental consortium damages, "[a]dult children may be too attenuated from their parents in some cases to proffer sufficient evidence of consortium losses." *Id.* at 601. Factors to consider in determining whether an adult child is entitled to consortium damages include "closeness of the relationship and dependence (*i.e.,* of a handicapped adult child, assistance with day care, etc.)." *Id.*

 The determination of the pecuniary value of a decedent's life is within the sound discretion of the trier of fact. *Hutton,* 968 S.W.2d at 812. The calculation is not to be "governed by fixed rules of mathematical precision," *id.,* and "[t]he permissible range of proof is very broad...." *McClanahan,* 1994 WL 248183, at \*3.

The State argues that the evidence preponderates against the trial court's award in the Snapp wrongful death case. In support of this argument, the State cites us to *McClanahan* and *Hutton* as being factually similar cases demanding the conclusion that the award in the instant case is excessive.

*McClanahan* involved the wrongful deaths of a retired elderly couple. *McClanahan,* 1994 WL 248183, at \*1. Mrs. McClanahan died immediately, and Mr. McClanahan died without regaining consciousness. *Id.* The McClanahan's two surviving children brought suit and presented proof, which showed medical expenses of $7,565 and funeral expenses of $9,900. *Id.* The children also "put on proof concerning their parents' age, life expec-

tancy, health, and personal habits, [but] they put on no proof concerning their parents' earning capacity." *Id.* This Court affirmed the trial court's determination that the proof was insufficient to warrant a recovery for the pecuniary value of the decedents' lives, and thus, the award was limited to the medical and funeral expenses. *Id.* at *4, *3.

*Hutton* also involved the wrongful deaths of a retired elderly couple, both of whom died instantly. *Hutton,* 968 S.W.2d at 810. Their son brought suit as administrator of their estates. *Id.* The proof showed ambulance and funeral expenses of $5,381.97 for each of the decedent's estates. *Id.* at 810–11. The son also presented proof that his father, who had a life expectancy of 6.53 years, received social security payments of $428 per month, and his mother, whose life expectancy was 13.37 years, received $427 per month in social security payments. *Id.* at 810. The trial court awarded $130,000 to each of the decedent's estates. *Id.* On appeal, we modified the trial court's award, finding that "[i]f the Huttons' expected incomes are added to their stipulated expenses, this evidence justifies awards of approximately $75,000 for Lena Hutton's estate and $40,000 for Floyd Hutton's estate," and that the evidence as to each decedent's social security payments and life expectancies was "[t]he only evidence quantifying the pecuniary value of the Huttons' lives." *Id.* at 812. We accordingly reduced the trial court's award, awarding the mother's estate $100,000 and the father's estate $55,000. *Id.* at 813.

■ We disagree that these two cases necessitate a reduction of the trial court's award to the Snapps to $5,280.35, the amount of Snapp's medical and funeral expenses. Significantly, *McClanahan* and *Hutton* were both decided prior to the Supreme Court's expansion in *Jordan* of the term "pecuniary value" to include consortium-type damages. Thus, the Snapp children are not limited in their recovery to medical and funeral expenses and loss of earning capacity. Their award may include incidental damages, including loss of consortium. With this in mind, we find that the trial court's award of $300,000 to the decedent's sons is not excessive.

The Snapp children presented much evidence concerning their father's work history. The highlights of his career include being owner/operator of a grocery store, being owner/operator of a laundry for over 30 years, and serving in a managerial capacity for a successful company for 38 years.

The sons also presented proof that, although their father retired around 1984 and sold the laundry in 1996, he still had the ability to engage in manual labor and to otherwise earn a living. More specifically, the proof showed that, even after retirement, the decedent was often initiating projects or assisting his family in various projects requiring manual labor.

Both sons, having grown up under their father's guidance, testified to an excellent relationship with him. They stated that their father was very active in their lives. They lived close by and would see their father three or four times a week and would talk even more regularly. Though neither child was dependent on their father for financial support, they would spend much time together, working in the yard, remodeling their homes, or working on other building projects. They also enjoyed time spent together at family gatherings and engaging in various outdoor activities. Both testified that they cherished those times and that they would still be enjoying them with their father if he had not died in the accident.

The decedent's life expectancy was 6.53 years. He had the usual living expenses such as utility bills, food, prescriptions, and other miscellaneous expenses. He also had his share of health problems. Among the conditions in his medical history are hip joint replacement, heart attack, congestive heart failure, pacemaker implantation, actinic keratosis, arthritis, and gout. For the ten years preceding the accident, the decedent had taken numerous medications. Still, the testimony established that the decedent's health problems did not significantly inhibit his activities, including his engagement in manual labor. Significantly, they did not adversely impact the decedent's ability to spend time with his two adult children.

Upon review of this evidence, we find and hold that the evidence does not preponderate against the trial court's award of $300,000 for the life of the decedent.

### E.

The Knowles' and the Snapps raise the issue of whether the State should be liable for sanctions for bringing a frivolous appeal. T.C .A. § 27–1–122 (2000) provides as follows:

When it appears to any reviewing court that the appeal from any court of record was frivolous or taken solely for delay, the court may, either upon motion of a party or of its own motion, award just damages against the appellant, which may include but need not be limited to, costs, interest on the judgment, and expenses incurred by the appellee as a result of the appeal.

This statute "must be interpreted and applied strictly so as not to discourage legitimate appeals." *Davis v. Gulf Ins. Group,* 546 S.W.2d 583, 586 (Tenn.1977) (discussing the predecessor of T.C.A. § 27–1–122). An appeal is deemed frivolous if it is devoid of merit or if it has no reasonable chance of success. *Industrial Dev. Bd. v. Hancock,* 901 S.W.2d 382, 385 (Tenn.Ct. App.1995); *Bursack v. Wilson,* 982 S.W.2d 341, 345 (Tenn.Ct.App.1998).

We find that this appeal is not so devoid of merit as to justify the characterization of it as frivolous. Accordingly, we decline to award damages for such an appeal.

### IV.

The judgment of the trial court is affirmed. The case is remanded for enforcement of the trial court's judgment and for collection of costs assessed below, all pursuant to applicable law. Costs on appeal are taxed to the State of Tennessee.