IN THE COURT OF APPEALS OF TENNESSEE
AT JACKSON
January 15, 2020 Session

## GARDENIA PARKER, ET AL. v. EPSTEIN ENTERPRISES, LLC, ET AL.

**Appeal from the Circuit Court for Shelby County**
**No. CT-003285-11, CT-003286-11        Jerry Stokes, Judge**

_____

**No. W2019-00311-COA-R3-CV**
_____

This is an appeal from a jury trial. The defendants own and manage an apartment complex in Memphis, Tennessee. In 2010, two pit bull dogs left one of the apartments and attacked two individuals in a neighboring lot. One of the individuals died on the scene. The jury found the defendants were at fault and awarded a total jury verdict of $2.5 million. The trial judge granted the defendants' motion for remittitur of the jury verdict and suggested remittitur of the award to $1.3 million. The plaintiff accepted the remittitur under protest. The defendants appeal, arguing that the trial court erred by denying their motion to amend their answers to assert comparative fault; denying their motion for a continuance; denying their motion for directed verdict; denying their motion for a mistrial due to comments made by plaintiff's counsel during closing arguments; and denying their motion for new trial due to juror misconduct. In her posture as appellee, the plaintiff asserts that the trial court erred in suggesting remittitur of the jury verdict. For the following reasons, we affirm the decision of the circuit court and remand for further proceedings.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed and Remanded**

CARMA DENNIS MCGEE, J., delivered the opinion of the court, in which J. STEVEN STAFFORD, P.J., W.S., and ARNOLD B. GOLDIN, J., joined.

John R. Branson (on appeal only) and Mitchell S. Ashkenaz, Memphis, Tennessee, for the appellants, Longview Heights Partners and Epstein Enterprises, LLC.

Ashleigh R. Buckley and William A. Buckley, III, Fort Smith, Arkansas, and Daryl A. Gray, New Orleans, Louisiana, for the appellee, Gardenia Parker, individually and as next of kin of Bessie Parker and William Parker.

## OPINION

### I.  FACTS & PROCEDURAL HISTORY

This case arises from a dog attack that occurred on July 20, 2010.  William Parker, age 71, was walking from his home to a nearby store when two pit bull dogs attacked and killed him in a vacant lot.  His daughter, Gardenia, age 26, was told by a witness that her father was being attacked and ran from Mr. Parker's home to the scene in an effort to assist him.  She tried to fight off the dogs and was also bitten.  When emergency personnel arrived, they were also attacked by the dogs.  The dogs were eventually removed by animal control.  Gardenia's bite wounds did not require any stitches, but she suffered a dislocated elbow when the dogs knocked her down.

On July 14, 2011, Mr. Parker's wife, Bessie Parker,[1] filed a complaint in the circuit court of Shelby County against numerous defendants.  Specifically, the complaint asserted various causes of action against the individual who owned the dogs; another individual who released the dogs from the apartment unrestrained; a realty company; John Doe; the City of Memphis; Shelby County; and the two appellants in the instant appeal, Longview Heights Partners and Epstein Enterprises, LLC, the owner and management company of the apartment complex where the dogs were housed.  Sam Epstein was the sole partner in Longview Heights Partners (owner of the apartments) and the sole partner in Epstein Enterprises, LLC (the management company).  Gardenia Parker filed a similar suit on her own behalf seeking to recover for her personal injuries.

Some defendants filed answers and asserted comparative fault.  Notably, Epstein Enterprises and Longview Heights Partners each filed answers, but neither asserted comparative fault.  The cases lingered in the trial court for several years.  Bessie Parker died in 2016.  The two cases were consolidated, and Gardenia Parker ("Plaintiff") was substituted as the plaintiff in both cases.  Thereafter, she was permitted to proceed individually and as next of kin of William Parker and Bessie Parker.

Most of the defendants were dismissed prior to trial, including the individual who owned the dogs, the individual who released the dogs, the realty company, Shelby County, and John Doe.  A jury trial was held from March 12 to March 16, 2018.  By that time, the only remaining defendants were the City of Memphis, Longview Heights Partners, and Epstein Enterprises.  The jury reported that it could not reach a unanimous verdict, and the trial court declared a mistrial.

The case was set to be retried in October 2018.  On October 3, 2018, a consent order of dismissal was entered, reflecting that Plaintiff had resolved her controversy with

---

[1] Because of the number of individuals who share the last name Parker, we will sometimes refer to various members of the Parker family by their first names.  We intend no disrespect.

the City of Memphis and agreed to dismiss her claims against the City with prejudice. On October 4, 2018, Epstein Enterprises and Longview Heights Partners filed a joint motion pursuant to Tennessee Rule of Civil Procedure 15.01 seeking to amend their answers in order to assert comparative fault of the City of Memphis, Shelby County, the individual who owned the dogs, and the individual who released the dogs. Plaintiff filed a response in opposition to the motion to amend, arguing that the remaining defendants should not be permitted to amend their answers to assert comparative fault when their answers were filed in 2012 and 2013 and the case was set to be retried in a matter of days, with trial beginning on October 15. Plaintiff asserted that the remaining defendants' attorney had been aware of her settlement with the City since mid-August.

After a hearing on October 12, the trial court entered an order denying the remaining defendants' motion to amend their answers to assert comparative fault. The trial court cited their "undue delay" in filing the motion, less than two weeks before the case was set to be retried. Noting that the retrial was scheduled to begin "in just three days" after the hearing, the trial court found that allowing the amendment at that late date would cause undue prejudice to Plaintiff. As a result, the trial court ruled that the remaining defendants would not be able to introduce evidence at trial showing that others caused the injuries at issue.

The second jury trial was held from October 15 to October 18, 2018. Mr. Epstein testified as to his role with Epstein Enterprises and Longview Heights Partners. Since his father's death in 2004, Mr. Epstein had been the sole member of both entities. He testified that Epstein Enterprises manages apartment complexes in Memphis, including the apartment complex at issue at 230/236 North Manassas. The complex was owned by a different entity, Longview Heights Partners, but Mr. Epstein was the sole partner in that partnership. Longview Heights Partners also owned other apartment complexes in Memphis.

Mr. Epstein explained that the Manassas apartment complex is very small, consisting of two six-unit buildings that face each other, with a courtyard between them. Because the complex is so small, there was no on-site property manager, but Mr. Epstein drove by the property on a weekly basis. He testified that he could see up and down the sides of both buildings from the street and normally did not stop his vehicle during his inspections. Mr. Epstein admittedly knew about the two pit bull dogs being kept at the Manassas apartment complex before the date of the attack. According to Mr. Epstein, he first became aware of the dogs on Monday, July 12, eight days before the attack on July 20. He testified that he drove by the complex for one of his routine weekly drive-by inspections of the property and noticed the dogs tied to a railing.

The following photograph of the two dogs was introduced at trial:

- 3 -



Mr. Epstein testified that when he saw the dogs for the first time on July 12, they were tied to the bottom stair railing of the apartment building below:



Mr. Epstein drove into the complex, got out of his vehicle, and approached the building. He testified that the dogs were not agitated, barking, or growling. The dogs were "just standing there" tied to the rail. Mr. Epstein testified that he "wasn't going to approach

- 4 -

them" but that he was close enough to see and hear them.[2]  He admittedly perceived that the dogs could pose a "potential" danger in the future.  However, he had never had a dog harm anyone on one of his properties and conceded at trial, "that wasn't my first concern."  Mr. Epstein said he was more concerned with the property damage that such large dogs could do inside a 450 square foot apartment.  The standard lease for the apartment complex provided that no pets were permitted without express written permission of Epstein Enterprises.

Mr. Epstein approached a group of individuals standing outside the apartment building and asked who owned the dogs.  They said that the dogs belonged to the boyfriend of the woman who rented the upstairs apartment.  The individuals told Mr. Epstein that she was out of town but that her boyfriend had moved in with the dogs and that he was upstairs.  Mr. Epstein testified that he decided to act quickly to remove the tenant and the dogs in order to protect his property and also the peace of his tenants.  At the same time, however, Mr. Epstein did not believe that the dogs posed an immediate danger.  He had a standing appointment to meet his attorney at court every Thursday to handle various matters, so he decided to address the situation with his attorney that day and proceed with eviction of the tenant.

Mr. Epstein saw the dogs on Monday, July 12, and his attorney filed a detainer warrant to evict the tenant on Thursday, July 15.  The tenant was served the following day, on Friday, July 16.  Mr. Epstein obtained a judgment for possession on July 22, one week after he filed the detainer warrant.  However, by that time, the attack had already occurred on July 20.  At trial, Mr. Epstein acknowledged that he could have filed a detainer warrant on the same day he saw the dogs or on the following two days.  However, he saw no reason to depart from his "normal procedure" of going to court on Thursdays.  He said, "It was my rule and it was my option to how I would enforce it and I decided that I wanted to enforce it within three days."  Mr. Epstein testified that even if he had acted immediately by filing a detainer warrant on July 12 when he saw the dogs, and if he had obtained a judgment for possession within seven days, on July 19, he still could not have obtained possession of the property before the attack because he would have had to wait ten days before filing a writ of possession.  By Mr. Epstein's calculation, the earliest he could have taken possession, even if he had filed a detainer warrant immediately, was August 4.  Mr. Epstein explained that he could not lawfully remove a tenant or a tenant's property from an apartment complex without court approval.

Mr. Epstein conceded, however, that he did not take any steps to address the dogs outside of the legal system, such as driving by the apartment complex again in the days

---

[2] Mr. Epstein acknowledged his deposition testimony in which he stated that he did not know if the dogs barked or yelped or anything like that because he "didn't get that close."  At trial, he insisted that he was close enough to observe if the dogs were barking or growling.

after he saw the dogs or attempting to contact the tenant directly. Mr. Epstein acknowledged that he had encountered dogs many times at various apartment complexes, and he proceeded in different ways depending on the circumstances. Sometimes, he wrote letters to the tenants advising them that they needed to have a pet deposit on file. Sometimes, he would advise tenants that dogs were not permitted and that they needed to get rid of the animal. Mr. Epstein testified that he did not attempt to approach the owner of the dogs in this instance because the dogs were blocking the stairwell, and it was his understanding that the actual tenant was out of town.

When asked why he did not call the police about the dogs, Mr. Epstein said there was no reason to do so because the dogs were not present illegally. Mr. Epstein considered this to be a civil matter, involving a mere lease violation, which he would have to pursue in court. Mr. Epstein testified that in his forty years of experience with property management, he had called the police and animal control in the past about various animals but to no avail. Mr. Epstein opined that if the owner of the dogs is present and the dogs are restrained, "there is nothing that they can do." According to Mr. Epstein, this was not a situation in which an outside agency or authority would remove the dogs. He emphasized that no one had been injured, no one had complained about the dogs, the dogs were not loose, and they were not being aggressive.

Mr. Epstein testified that no one had complained about the dogs or otherwise informed him of their presence, and he insisted that he had never seen the dogs before July 12. He occasionally sent employees to the apartment complex in response to repair calls, and he hired a lawn service company out of Mississippi to mow the lawn once a week. However, Mr. Epstein said no one ever mentioned the dogs to him. He testified that this particular tenant had only recently moved into the apartment, and he introduced her lease, dated June 1, as an exhibit.

The jury also heard testimony from William Parker's niece, Alecia McCoy. She resided in the Manassas apartment complex owned by Longview Heights Partners when her uncle was attacked. She estimated that she had been living in the apartments "around six or seven months, around that timeframe." She said she had observed the two dogs barking and jumping while tied up outside the apartments "every day." Ms. McCoy described the dogs as aggressive and said they scratched and bit at the doors. She testified that the lawn maintenance crew had been present "[p]lenty of times" while the dogs were outside barking and jumping. However, Ms. McCoy conceded that she never reported the dogs to management, and she was not aware of anyone else reporting the dogs either. She said, "[T]hey wasn't bothering me at all. They just was there barking and yelling and it was more aggravating than anything." (sic) Ms. McCoy testified that her cousin Gardenia was devastated by the loss of her father. She explained that Gardenia was an only child and had a very close relationship with her parents. Ms. McCoy testified that her aunt, Bessie Parker, was similarly depressed and hurt after the death of her husband.

- 6 -

The jury also heard testimony from another cousin of Gardenia, Kenosha Blue. Ms. Blue was present at the home of William and Bessie Parker on the date of the attack. Ms. Blue testified that Mr. Parker left to walk to the store, and no more than five minutes later, a man knocked on the door to inform them that Mr. Parker was being attacked by pit bulls. Ms. Blue ran with Gardenia a couple of blocks down the street and saw the dogs biting Mr. Parker on the ground in the empty lot beside the apartments. Ms. Blue testified that by the time they arrived at the field and saw Mr. Parker, "he was not alive." She said they grabbed objects to use as weapons against the dogs and attempted to "fight them off." Ms. Blue testified that the dogs were trying to bite them as well and that Gardenia dislocated her arm in the struggle. Ms. Blue had never seen the dogs before.

Ms. Blue testified that her uncle seemed to be in good health before he died and that he walked to many places. She described the happy relationship he had with his wife. Ms. Blue also testified that Mr. Parker made sure that Gardenia and Bessie were "taken care of." She said Gardenia seemed depressed after her father's death and stayed at home more. Ms. Blue said that Gardenia's life was totally different after her father died. She said Bessie moved out of state because she could not stand the sight of where her husband had been, and "she got a little sicker and a little sadder."

Gardenia's daughter, Terrica Parker, testified as well. She was sixteen years old at the time of trial but in elementary school when her grandfather was killed. Terrica lived with William and Bessie at the time of his death, while Gardenia lived with Terrica's father in an apartment. Terrica recalled seeing the two dogs "always chained up on the steps" of the Manassas apartments when she would go to visit her mother, who lived in those apartments for a period of time.

Terrica testified to the close bond that Mr. Parker had with Gardenia and the relationship he had with his wife. She remembered Mr. Parker as "very active and full of life" even in his old age. Terrica recalled the changes in her grandmother after he was killed, noting that she did not cook nearly as often or go for walks outside. Terrica testified that Bessie was very sad and "just moped around," mostly watching television. Eventually, she moved to Detroit. Terrica testified that Gardenia had similarly shut herself off from a lot of people after the loss of her father. She described Mr. Parker as "the backbone" of the family and said everyone drifted apart after he died. Terrica's father provided similar testimony about Mr. Parker being fairly active and how his death impacted Gardenia. He described her as more reserved and "a totally different person."

The deposition testimony of Bessie Parker was introduced as well. She was sixty-five years old when her husband died. They were married approximately 29 years. When asked about Mr. Parker's health prior to his death, Bessie responded that "he was sickly." She testified that Mr. Parker worked in the past as a carpenter, paving streets for the City of Memphis, and mowing yards, but he had to stop working because of "real

bad" high blood pressure. Bessie testified that Mr. Parker was receiving social security disability benefits. She testified that she could no longer afford her house note after the family stopped receiving two checks, so she had to "let [the] house go." Bessie said she had become "more sickly" since her husband died, although she acknowledged that she took so much medicine she did not know if it was due to the incident. Bessie testified that it was as if she lost her husband *and* her daughter on the day of the attack because she and Gardenia did not speak as often after the incident. She said, "it's hell living with this."

Bessie recalled seeing the dogs prior to the attack when she walked up and down the street. She said they would bark and "rear up." The first time she heard the dogs barking was a couple of weeks before the attack, but she had observed the dogs "up there, just laying," two or three times before that occasion. She had never seen the dogs running loose, and she had never heard of anyone complaining about the dogs prior to the incident. On the day of the attack, Bessie saw the same dogs lunging at the emergency personnel who responded to the scene. The emergency personnel restrained Bessie on the day of the attack, at Gardenia's instruction, and would not allow her to go all the way to the scene.

Police officer Nicki Russell testified about her observations from responding to the scene on the date of the attack. She described the dogs as very vicious and aggressive. Officer Russell testified that when she arrived on the scene, emergency personnel had climbed onto their vehicles to avoid the dogs. Another officer's deposition testimony was read into the record. He said these dogs "weren't your typical dogs." He described how they bit emergency personnel on the scene and continued to bite Mr. Parker until the police officer eventually ran over the dogs multiple times with his police car. The second officer said the dogs were "in attack mode." The officer said that Mr. Parker appeared to be deceased when he was removed from the scene by emergency personnel.

The final witness to testify for the plaintiff was Gardenia herself. Gardenia testified that she was an only child and said that her father was her best friend and her hero. She said Mr. Parker routinely did yard work, went fishing, and visited with friends on the front porch. She testified that her father walked everywhere because her family did not own a car. Gardenia also testified that her father gave her money on occasion. She described the very close relationship between her parents, although she said they had separated once when they "got older" and moved into separate residences for a few weeks.

Gardenia confirmed that she lived in the Manassas apartment complex, which was near her parents' home, for a short time. She estimated that she lived there for around six months but said she had moved somewhere else before the date of the attack. Gardenia had never seen Mr. Epstein during the time she resided there. She did recall seeing the

dogs "[q]uite often." Gardenia testified that she would see the dogs tied up in the front of the building and also in the rear of the building. She said every time anyone walked through the area, the dogs would bark, growl, and try to jump. However, she never saw the dogs off leash or running loose. She never complained to Mr. Epstein or anyone else about the dogs.

Gardenia also testified about the day of the attack. She was visiting her parents when her father left to go to the store. Gardenia recalled the man coming to the door shortly thereafter to tell them that her father was being attacked by dogs. She and her cousin "took off" toward the empty lot and saw him there being bitten. They yelled at the dogs and tried to stop them from attacking her father. Gardenia testified that the dogs started biting her on her arm, leg, and thigh and knocked her down.

Gardenia said that the dogs finally ran away, and then she was able to reach her father. According to Gardenia, her father was still breathing very lightly, and she pulled him up on her legs and spoke to him. Gardenia said that her father just looked at her and took his last breath in her arms. She described how that memory of her father's eyes and his wounds had hurt her ever since. Gardenia said she was hurt by the fact that she was not able to save his life and questioned if she could have saved him if she had only walked with him to the store that day. Gardenia testified that she shut herself off from everyone because of her emotions and "breaking down" when she thought about it. She had not received any counseling, but she believed that she needed it. Gardenia said she had not sought counseling because she did not want to talk about it, and she could not afford it. She also described how her mother changed after the attack and said she had "no more drive." As for Gardenia's physical injuries, she testified that her bite wounds did not require stitches but that she still had "marks" from the bites. She was treated at the hospital and released that same day. She last received treatment two months after the incident, in 2010.

The jury also heard 911 calls from the date of the attack and viewed photographs of the scene and Mr. Parker's injuries. At the end of Plaintiff's proof, Epstein Enterprises and Longview Heights Partners moved for directed verdict. The defendants argued that Mr. Epstein acted expeditiously in the only manner available to him under the law, and therefore, neither defendant could be held at fault for the events that followed. In response, Plaintiff maintained that Mr. Epstein did not act reasonably upon seeing the dogs. Plaintiff argued that Mr. Epstein was not limited to utilizing the court system and that he could have taken alternative measures such as contacting the police, animal control, the tenant, or the dog owner. Plaintiff suggested that Mr. Epstein could have posted warning signs at the complex or returned to check on the property while the case was pending. The trial court denied the motion for directed verdict, noting Plaintiff's argument that Mr. Epstein could have taken action aside from the legal proceeding. Looking at the evidence in the light most favorable to Plaintiff, he said, "I'll let that be a jury question."

- 9 -

The defendants then presented their proof. The only witness they called was Officer William Horn of the Memphis Police Department. Officer Horn responded to a "loose dog" call at the Manassas apartment complex on July 18, 2010, two days before the attack on Mr. Parker. Officer Horn testified that when he arrived at the complex, he found two pit bull dogs, but they were tied to a stairwell in the rear of the building. Officer Horn testified that he walked up to the two dogs fairly slowly and stuck his hands out toward them. He said the dogs were "fine," acting "excited to see me, but they weren't aggressive." They did not bark or growl. Officer Horn said the dogs "just seemed like happy little dogs." He said the dogs sniffed at him, then he petted both dogs. Officer Horn made sure that both dogs had food and water. He then stepped over the dogs and went up the stairs to contact the resident in the upstairs unit and try to find out who owned the dogs. Officer Horn spoke to the occupant, and the dogs were brought upstairs to the apartment. The dogs walked past Officer Horn and did not growl, bark, or act aggressive in any way. Officer Horn estimated that he spent three to four minutes with the dogs when he initially arrived on the scene, petting them and making sure they were not vicious. However, he was on the scene for a considerably longer period.[3]

The defendants did not present any additional witnesses but did present an offer of proof as to some matters excluded by the trial court because they related to comparative fault. The trial judge read the instructions to the jury, and the attorneys made their closing arguments. Counsel for the defendants objected repeatedly during Plaintiff's counsel's closing argument on the basis that Plaintiff's counsel was making inflammatory statements. His first three objections were overruled. The defendants objected yet again, and this time moved for a mistrial, when Plaintiff's counsel made the following statement:

> "But you know what. You could send a message, a message for Gardenia Parker another $500,000.00, for Bessie Parker another $500,000.00 -- "

The trial judge sustained the objection to this statement but denied the defendant's motion for a mistrial. The trial judge instructed the jury to "disregard the last remark by Mr. Gray [Plaintiff's counsel] with regard to sending a message."

On the final day of trial, the jury deliberated and announced its verdict in favor of Plaintiff. The trial judge read the verdict form aloud. It asked a single question as to liability: "[D]o you find that the defendants Epstein Enterprises, LLC and Longview

---

[3] On cross-examination, Officer Horn was asked if he recalled his deposition testimony when he was asked whether he petted one or both dogs and qualified his answer by stating, "I think I petted them both. They both – it's been a minute. I may have confused it with another situation. But if I remember it correctly, as I approached the stairwell both dogs just sort of came toward me." Officer Horn recalled his deposition but not the "exact wording" of his answer. However, he agreed it was "possible" he "may have had it confused with another situation."

Heights Partners to be at fault," and the answer was marked "yes." The verdict form listed several spaces for damage awards. Question two asked for the "compensatory damages" that Gardenia proved she suffered as a result of defendants' actions or inaction, and the jury awarded $500,000. The third question on the verdict form addressed damages "for the death of William Parker" and listed three spaces for possible subcategories of damages. For "Mental and physical suffering endured by William Parker between injury and death," the jury awarded $1 million. For "loss of consortium" suffered by Bessie Parker, the jury awarded $500,000, and for "loss of consortium" suffered by Gardenia Parker, the jury awarded $500,000.[4] This resulted in a total jury verdict of $2.5 million. Each individual juror confirmed that he or she agreed with the verdict. The trial judge thanked the jurors for their service, and the jury was excused.

As the trial judge and the attorneys were collecting and discussing the exhibits, the following exchange took place:

THE COURT: All right. Juror No. 9, Ms. [C.C.] has voiced something to my court officer, Officer Washington that she wants to share with the Court and I would prefer that whatever she has to say to share it with all of you. It may be relevant. It may not. I will let you all assess it as I will assess and ask questions if necessary. Bring her out, please.

(Whereupon, Ms. [C.C.] entered the courtroom.)

THE COURT: Good morning, Ms. C[.]

MS. C[.]: Good morning.

THE COURT: State your name for the record.

MS. C[.]: [C.C.]

THE COURT: My court officer, Officer Washington indicated that you related something to him at the conclusion of the announcement of the verdict and the polling of the jury when I announced and asked everybody was this his or

---

[4] "The nature of a loss of consortium claim in Tennessee turns on the context in which it is asserted. In a wrongful death action, loss of consortium is an element of damages awardable under the wrongful death statute as part of the pecuniary value of the decedent's life." *Igou v. Vanderbilt Univ.*, No. M2013-02837-COA-R3-CV, 2015 WL 1517794, at *3 n.2 (Tenn. Ct. App. Mar. 27, 2015) (citing *Taylor v. Beard*, 104 S.W.3d 507, 509 (Tenn. 2003); *Jordan v. Baptist Three Rivers Hosp.*, 984 S.W.2d 593, 601 (Tenn.1999)).

her verdict. And you announced that it was your verdict. Is that correct?

MS. C[.]:          Yes.

THE COURT:          Okay. You also related something to Officer Washington. I want you to share that information to these lawyers as well.

MS. C[.]:          And this could be my mistake. But when we went in to deliberate – I am nervous – one of the jurors talked about how he had worked – in that aerial picture there is that church.

          He had worked with I guess there was a lawn service and talked about seeing the dogs. He also talked about having to he said clean up after the crime scene. I guess maybe they mowed that field that's the grassy area. And nobody said anything. But then as I thought about it I was like I don't know if that – it felt like something that I needed to share.

THE COURT:          Very good. You don't need to be nervous. And thank you very much for that information. You may be asked questions later from these lawyers. I'm not going to develop that. I will let them talk to you if they want to later. Was there anything else you wanted to share about the conversation?

MS. C[.]:          No.

THE COURT:          I have got one other question. When the person indicated he knew or saw or had been around that area, did he say that he knew any of the parties involved?

MS. C[.]:          No. He did make reference to the dogs. He stated that I guess his crew often times would see dogs – he made reference to dogs. I am not implying that they were those dogs.

THE COURT:          Sure.

MS. C[.]:          And then he talked about seeing the crime scene.

- 12 -

THE COURT:        And when he said his crew, what kind of crew?

MS. C[.]:          A lawn maintenance crew.  He said he would mow those areas.

THE COURT:        Did he mow the area where these apartments were?

MS. C[.]:          He was referencing – because he asked for the aerial picture.  I think he was referencing I guess the grass near the church.

THE COURT:        I see.

MS. C[.]:          So it was not my understanding that he was talking about the apartments.

THE COURT:        That is what I am getting at.

MS. C[.]:          Yes.

THE COURT:        Very good.  All right.  Thank you so very much.  You are excused.

MS. C[.]:          Thank you.

(Ms. C[.] exited the courtroom.)

MR. MOORE:        Your Honor, please.  When you said the lawyers will get a chance to ask questions do you mean somewhere other than here and now?

THE COURT:        That is correct.  All right.  I wanted to bring that to your attention.  You can follow up if you would like to.  You can leave it alone if you want to.  I am sure I will see you all again.  But my role is to let you know what I know if there is something that I think that needs to be brought to everybody's attention, so I leave you to your own devices.

MR. MOORE:        Before the record is closed, I move for a mistrial based upon juror misconduct.

The trial judge directed defendants' counsel to file a written motion with the court, and

- 13 -

the proceedings were adjourned.

The trial court entered its judgment order on the jury verdict of $2.5 million.[5]  The defendants subsequently filed a motion for judgment notwithstanding the verdict, for new trial, or for remittitur.  In this motion, the defendants asserted numerous errors.  They argued that the trial court erred by denying their motion to amend to assert comparative fault; denying their oral motion for a continuance; denying their motion for a mistrial due to counsel's statements during closing arguments; and denying their motion for directed verdict.  The defendants maintained that Mr. Epstein acted in the only reasonable and legal way he could by filing an eviction action, as he had no knowledge that the dogs were vicious.  The defendants also moved for a new trial on the basis of juror misconduct.  Finally, the defendants argued that the jury verdict of $2.5 million was outside the range of reasonableness and should be reduced.

After a hearing, the trial court entered an order denying the defendants' motion for judgment notwithstanding the verdict and motion for new trial but suggesting a remittitur.  The trial court found that it properly denied the motion to amend due to "undue and unexplained delay in filing" and prejudice to Plaintiff given that the motion was filed less than two weeks before the second trial.  The trial court found that it properly denied the motion for directed verdict because a genuine issue of material fact existed regarding whether the defendants had notice of the vicious propensities of the dogs and acted in a timely and reasonable manner.  Regarding closing arguments, the trial court found that it sustained an objection when it deemed it appropriate and gave a curative instruction.  Regarding the issue of juror misconduct, the defendants submitted a transcript of a statement that C.C. gave to a private investigator after trial.  The trial court ruled that the statement from the private investigator was hearsay and could not serve as the basis for impeaching a jury verdict.  The trial judge also noted that no one asked the jurors during voir dire if they knew anything about this case.  Finally, with respect to the jury verdict of $2.5 million, the court found that the award was "not supported by the evidence in this case" but "excessive and above the range of reasonableness."  The trial court suggested reducing the jury's verdict for compensatory damages for Gardenia Parker to $150,000.  It suggested reducing the award for mental and physical suffering endured by William Parker to $750,000.  The court suggested reducing both awards for "loss of consortium" to $200,000 each.  This would reduce the total jury verdict to $1.3 million.

Plaintiff filed a motion to reconsider the suggestion of remittitur, which the trial

---

[5] We note that the order of judgment correctly stated that the total jury verdict was $2.5 million and that Gardenia Parker's compensatory damage award was $500,000.  However, it contained a scrivener's error as to the allocation of the third category of damages.  The jury verdict form, read by the trial judge at trial, stated that the jury awarded $1 million for Mr. Parker's pain and suffering and $500,000 for each of the "loss of consortium" awards.  However, the judgment order erroneously stated that the jury had awarded $1.5 million for Mr. Parker's pain and suffering and $250,000 for each of the "loss of consortium" awards.

court denied after another hearing. Plaintiff then filed notice of acceptance of the remittitur under protest with intent to appeal. The trial court entered a final order of judgment reciting its various rulings on the post-trial motions and entering judgment for $1.3 million. The defendants timely filed a notice of appeal.

## II. ISSUES PRESENTED

Epstein Enterprises and Longview Heights Partners present the following issues, which we have rearranged and slightly restated, for review:

1. Whether the trial court committed reversible error in denying the defendants' motion to amend their answers to allege comparative fault as an affirmative defense, which led to various related rulings at trial;

2. In the alternative, whether the trial court committed reversible error by denying the defendants' oral motion for continuance of the trial;

3. Whether the trial court committed reversible error in denying the defendants' motion for directed verdict when there was no evidence that Sam Epstein had knowledge of any propensity for viciousness on the part of the dogs or could have anticipated that they would be released unrestrained in the manner that they were, and there was no evidence that he could have taken remedial measures that more likely than not would have caused a better outcome;

4. Whether the trial court erred by denying the defendants' motion for a mistrial due to Plaintiff's counsel's improper, prejudicial, and inflammatory argument to the jury during closing argument;

5. Whether the trial court erred by denying the defendants' motion for new trial based on juror misconduct where the juror failed to disclose personal knowledge of critical facts of the case during voir dire or at any other time but disclosed that personal knowledge and opinions to the other jurors during deliberations;

6. In the event of a remand and retrial due to these issues, whether the defendants should be allowed to raise the affirmative defense of comparative fault.

In her posture as appellee, Plaintiff challenges the trial court's suggestion of remittitur of the jury verdict. For the following reasons, we affirm the decision of the circuit court and remand for further proceedings.

## III. DISCUSSION

### A. Motion to Amend & Motion for Continuance

The defendants combined their arguments regarding the first two issues into one section of their brief on appeal, so we will discuss those issues together as well. They contend that the trial court committed reversible error in denying their motion to amend their answers to allege comparative fault as an affirmative defense. They also argue that

the trial court erred by denying their oral motion for a continuance of the retrial date, which was apparently made during the hearing on the motion to amend.

The defendants argue that the denial of their motion to amend had a devastating impact on their case because the trial court made various rulings at trial in light of the fact that defendants had not pled comparative fault. For instance, the defendants note that the trial judge did not allow them to read certain allegations from Plaintiff's complaint, it limited their cross-examination of a police officer employed by the City, and it refused to allow evidence of a guilty plea entered by the individual who released the dogs unrestrained. The defendants acknowledge that "the late notice of the intent to argue the defense [of comparative fault] may have caused Plaintiff's counsel to be surprised." However, they argue that the underlying facts were known all along because comparative fault was raised by the City of Memphis in its answer and argued during the first trial. Considering all these circumstances, the defendants argue that the trial court committed reversible error by denying their motion to amend to assert comparative fault.

In response, Plaintiff emphasizes that the defendants waited roughly six years after filing their answers to seek to amend them to assert comparative fault. Plaintiff notes that their motion to amend came less than two weeks before the second trial began, when they had prepared for the retrial for months under the belief that the remaining defendants were not asserting comparative fault. According to Plaintiff, the defendants provided no reason for their undue delay in asserting the affirmative defense.

"Under the Tennessee Rules of Civil Procedure, a party may amend its pleadings once as a matter of course before a responsive pleading is served." *Abdur'Rahman v. Parker*, 558 S.W.3d 606, 620 (Tenn. 2018) (citing Tenn. R. Civ. P. 15.01). When a responsive pleading has already been filed by the opposing party, "the party seeking to amend must obtain written consent of the adverse party or leave of court, 'and leave shall be freely given when justice so requires.'" *Id.* (quoting Tenn. R. Civ. P. 15.01). "'Trial courts have broad authority to decide motions to amend pleadings and will not be reversed absent an abuse of discretion.'" *Id.* (quoting *Pratcher v. Methodist Healthcare Memphis Hosps.*, 407 S.W.3d 727, 741 (Tenn. 2013)). Appellate courts "will uphold the trial court's denial of a motion to amend 'so long as reasonable minds can disagree as to the propriety of the decision made.'" *Brown v. Mapco Exp., Inc.*, 393 S.W.3d 696, 701 (Tenn. Ct. App. 2012) (quoting *Eldridge v. Eldridge*, 42 S.W.3d 82, 85 (Tenn. 2001)).

Numerous factors guide a trial court's discretionary decision regarding whether to allow an amendment of the pleadings, including "'undue delay in filing the amendment, lack of notice to the opposing party, bad faith by the moving party, repeated failure to cure deficiencies by previous amendments, undue prejudice to the opposing party, and the futility of the amendment.'" *Blackwell v. Sky High Sports Nashville Operations, LLC*, 523 S.W.3d 624, 656 (Tenn. Ct. App. 2017) (quoting *Gardiner v. Word*, 731 S.W.2d 889, 891-92 (Tenn. 1987)). The most important factor is "the proposed

amendment's potential prejudicial effect on the opposing party." *Hardcastle v. Harris*, 170 S.W.3d 67, 81 (Tenn. Ct. App. 2004). "Late amendments fundamentally changing the theory of a case are generally not viewed favorably when the facts and theory have been known to the party seeking the amendment since the beginning of the litigation." *Id.* Such amendments are usually denied "when the opposing party can legitimately claim surprise or when it will (1) cause additional expense and the burden of a more complicated and lengthy trial, (2) require the opposing party to engage in significant additional pre-trial preparation, (3) unduly increase discovery, or (4) unduly delay the trial." *Id.*

This case was filed in 2011, and the defendants filed their motion to amend on October 4, 2018. The hearing on the motion to amend was held on October 12, 2018. The trial court denied the motion to amend based on the defendants' "undue delay" in seeking the amendment, as the motion was filed less than two weeks before the scheduled retrial and heard just three days before trial. The trial court found that allowing the amendment at that late date would cause "undue prejudice" to Plaintiff. During the post-trial hearing at which the defendants sought a new trial based on the denial of their motion to amend, the trial judge further elaborated on his reasoning. He explained that seven years was "an unusually long length of time" before seeking an amendment, particularly in light of the fact that the date of the second trial was approaching. The trial judge said he had expected a motion to amend to be forthcoming after the first trial resulted in a mistrial. The trial judge said that at that point, even though the case had been pending for a long time, he probably would have entertained such a motion favorably. However, no motion was filed at that time. The trial judge said that even as of the date of the post-trial hearing, he still had not heard any explanation for why there was such a long delay in seeking the amendment. The trial judge said he considered the applicable factors, including the fact that the second trial date was days away. The trial judge said he stood by his original conclusion that the defendants' motion to amend came too late.

The record reveals that the trial judge based his decision on appropriate factors, and we cannot say that he abused his discretion in denying the defendants' late-filed motion to amend seeking to assert a new affirmative defense just days before the retrial of this case. Recognizing "the time-honored principle that the determination of whether to allow an amendment to the pleadings is left to the sound discretion of the trial court," *Pratcher*, 407 S.W.3d at 741 (quotation omitted), we affirm the trial court's discretionary decision to deny the motion to amend as untimely and unduly prejudicial.

Although we do not have a transcript of the hearing on the motion to amend, it appears that the defendants orally moved for a continuance of the second trial date at some point during that hearing, apparently in an attempt to diminish the unfair prejudice

claimed by Plaintiff.[6]   On appeal, the defendants suggest that any undue prejudice to Plaintiff from their proposed late-filed amendment "could have been cured" by the granting of a continuance.   This Court reviews a trial court's refusal to grant a continuance for abuse of discretion. *Eisenstein v. WTVF-TV, News Channel 5 Network, LLC*, 389 S.W.3d 313, 319 (Tenn. Ct. App. 2012) (citing *Regions Fin. Corp. v. Marsh USA, Inc.*, 310 S.W.3d 382, 401 (Tenn. Ct. App. 2009)).   "Decisions regarding continuances are fact-specific[,] and motions for a continuance should be viewed in the context of all the circumstances existing when the motion is filed." *Howell v. Ryerkerk*, 372 S.W.3d 576, 580 (Tenn. Ct. App. 2012) (internal quotations omitted).   Some factors to consider are "'(1) the length of time the proceeding has been pending, (2) the reason for the continuance, (3) the diligence of the party seeking the continuance, and (4) the prejudice to the requesting party if the continuance is not granted.'" *Id.* at 580-81 (quoting *Nagarajan v. Terry*, 151 S.W.3d 166, 172 (Tenn. Ct. App. 2003)).

Again, we cannot say that the trial court abused its discretion in denying the defendants' oral motion for a continuance of the retrial three days before it was set to begin when the case had been pending for seven years. *See George v. Bldg. Materials Corp. of Am.*, 44 S.W.3d 481, 487 (Tenn. 2001) (concluding that the appellant "should not have been forced to accept a continuance to meet a last-minute [] defense raised by [the opposing party]").   We affirm the trial court's decision on this issue.

### B.    Motion for Directed Verdict

The next issue raised by the defendants is whether the trial court committed reversible error in denying their motion for directed verdict.   The defendants assert that the trial court should have granted their motion for directed verdict at the close of Plaintiff's proof because there was no evidence that Mr. Epstein had knowledge of any propensity for viciousness on the part of the dogs or that he could have anticipated that the dogs would be released unrestrained in the manner that they were.   The defendants also argue there was no evidence that Mr. Epstein could have taken any remedial measures that more likely than not would have caused a better outcome.   As such, the defendants argue that the trial court should have directed a verdict on the issues of duty, breach, and causation.

In response, Plaintiff argues that the issue of whether the trial court erred in denying the defendants' motion for directed verdict was "improperly submitted to this Court and foreclosed from consideration because Defendants did not move for directed verdict at the close of their case at trial."   Although the defendants moved for a directed

---

[6] At trial, the attorneys were discussing the trial court's order denying the motion to amend, and counsel for the defendants stated, "I probably need to give you a separate order that denies the ore tenus motion for continuance."   The trial judge responded, "I think we should for the record."   However, it appears that no such written order was entered.

verdict at the close of Plaintiff's proof, they did not renew their motion at the close of all the proof. We agree with Plaintiff on this issue.

As the Tennessee Supreme Court explained in *State v. Thompson*, 549 S.W.2d 943, 945 (Tenn. 1977):

> If a motion [for directed verdict] made at the conclusion of the plaintiff's proof is overruled, the defendant must stand upon his motion, and rest his case without offering proof, in order to have the record at that point preserved for appellate review. If the motion is overruled and the defendant does not stand upon the motion, but rather proceeds to offer evidence, then it is necessary for the defendant to "renew" his motion actually to make another motion at the end of all of the evidence in order to have the same considered. Both the trial and appellate courts then review the entire record, not just the plaintiff's case in chief, in determining whether the defense motion should be granted.

In their reply brief on appeal, the defendants concede that their trial counsel "did not expressly, orally renew their Motion for a Directed Verdict after their case in chief." However, the defendants claim that their counsel's substantive arguments on the issue of duty, breach, and causation were discussed at length when reviewing the jury instructions, and they were asserted in a post-trial motion for judgment notwithstanding the verdict or for new trial. Thus, the defendants argue that they "substantially renewed" their motion for directed verdict made at the close of Plaintiff's proof. The defendants also argue that the caselaw on which Plaintiff relied was outdated and prior to the adoption of the Tennessee Rules of Civil Procedure. They urge this Court to follow the "modern trend" taken in federal courts, which no longer require renewal of a motion for directed verdict at the close of all the proof.[7]

The law in Tennessee is well-established on this issue, and it is not the role of this Court to depart from it. *See, e.g., Searle v. Bryant*, 713 S.W.2d 62, 66 (Tenn. 1986) ("It is well-settled that a defendant waives his right to rely on error in the denial of his motion for directed verdict made at the end of the plaintiff's proof if he goes forward with his own proof rather than resting on the motion."); *Hatfield v. Allenbrooke Nursing & Rehab. Ctr., LLC*, No. W2017-00957-COA-R3-CV, 2018 WL 3740565, at *28 (Tenn. Ct. App. Aug. 6, 2018) *perm. app. denied* (Tenn. Jan. 17, 2019) ("[F]ollowing the denial of Defendants' motion for directed verdict at the close of Plaintiff's proof, Defendants chose to present their own evidence. As such, consideration of the trial court's initial decision to

---

[7] *See* Fed. R. Civ. P. 50, Adv. Comm. Note to 2006 Amendment ("Rule 50(b) is amended to permit renewal of any Rule 50(a) motion for judgment as a matter of law, deleting the requirement that a motion be made at the close of all the evidence. . . . Although the requirement has been clearly established for several decades, lawyers continue to overlook it.")

deny the motion for directed verdict is waived."); *McLemore ex rel. McLemore v. Elizabethton Med. Inv'rs, Ltd. P'ship*, 389 S.W.3d 764, 778 (Tenn. Ct. App. 2012) ("For this Court to review the sufficiency of the evidence on appeal, a motion for a directed verdict must have been made at the conclusion of all of the proof and renewed in a post judgment motion following the jury's verdict."); *McDonald v. Metro. Gov't of Nashville & Davidson Cty.*, No. M2004-02852-COA-R3-CV, 2006 WL 846000, at *3 (Tenn. Ct. App. Mar. 31, 2006) ("Metro failed to renew its motion for a directed verdict at the close of all the evidence. Failing to do so constituted a waiver of the issue."); *Steele v. Columbia/HCA Health Care Corp.*, No. W2001-01692-COA-R3-CV, 2002 WL 1000181, at *3 (Tenn. Ct. App. May 13, 2002) ("[I]n order for this Court to review the sufficiency of the evidence on appeal, the motion for a directed verdict must have been made at the conclusion of all of the proof and renewed in a post judgment motion following the jury's verdict."); *Cortez v. Alutech, Inc.*, 941 S.W.2d 891, 894 (Tenn. Ct. App. 1996) ("Once Appellants moved for a directed verdict at the close of Appellees' proof, it was incumbent upon them to renew their motion at the close of all the proof as an initial step to preserving the issue for review on appeal."); *Boyd v. Sears, Roebuck & Co.*, 1986 WL 3162, at *1 (Tenn. Ct. App. Mar. 12, 1986) ("When a defendant moves for a directed verdict at the conclusion of plaintiff's proof but fails to renew the motion at the conclusion of all the proof, it waives its right to raise the issue on appeal."); *Potter v. Tucker*, 688 S.W.2d 833, 835 (Tenn. Ct. App. 1985) ("The motion must be made at the conclusion of all the proof in order for it to be considered by the trial court on a post trial motion and by this court on appeal.").

Because the defendants moved for directed verdict only at the close of Plaintiff's proof and did not renew their motion at the close of all the proof, the defendants waived review on appeal of the denial of their motion for directed verdict. *See id.* They are not entitled to relief with respect to this issue.

### C.    *Motion for Mistrial During Closing Argument*

The next issue raised by the defendants on appeal is whether the trial court erred by denying their motion for a mistrial due to Plaintiff's counsel's improper, prejudicial, and inflammatory argument to the jury during closing argument. As previously discussed, counsel for the defendants objected repeatedly during closing argument on the basis that Plaintiff's counsel was making inflammatory statements. The trial judge overruled the defendants' objections to the first three statements.[8] Then, Plaintiff's counsel stated,

---

[8] The trial judge overruled objections to the following statements:

"How many times do poor people have to suffer at the hands of the powerful."
"I guess when a human life doesn't matter what is three days in the grand scheme of things."
"This is your community. And I submit to you this. If this would have happened somewhere else, Germantown, those dogs would have been removed."

"But you know what.  You could send a message, a message for Gardenia Parker another $500,000.00, for Bessie Parker another $500,000.00 -- "

At that point, the defendants objected again and, for the first time, moved for a mistrial. Counsel for the defendants succinctly stated the basis for his motion as follows:

I object.  That is improper argument.  Any argument that says you can send a message, ladies and gentlemen, is irreversible error if a mistrial is not granted and I move for a mistrial.

The trial judge sustained the objection, stating, "that is the type of language we use when you talk about punitive damages sending a message and we are not here to send messages. You can argue about holding somebody accountable, but sending messages, you are getting into a claim for punitive damages and this is not a punitive damage claim."  The trial judge announced that he would instruct the jury to disregard the last remark with regard to sending a message.  However, the trial judge denied the motion for a mistrial.  He stated, "I don't find that you've been prejudiced to the point that this instruction I'm giving the jury won't cure."  The trial judge then instructed the jury to "disregard the last remark by Mr. Gray [Plaintiff's counsel] with regard to sending a message."

The precise issue raised by the defendants on appeal is whether the trial court erred "by denying the [defendants'] Motion for a Mistrial[.]"  We note that the defendants only moved for a mistrial with respect to the "send a message" argument. They did not move for a mistrial based on the other earlier statements made by Plaintiff's counsel and the earlier related objections.  They only moved for a mistrial because Plaintiff's counsel asked the jury to "send a message."

A "mistrial" is defined as "[a] trial that the judge brings to an end without a determination on the merits because of a procedural error or serious misconduct occurring during the proceedings." *Black's Law Dictionary* (11th ed. 2019).  "A motion for the entry of a mistrial is a procedural device which requests the trial court to stop the trial, discharge the jury, and impanel another jury[.]" *State v. McPherson*, 882 S.W.2d 365, 370 (Tenn. Crim. App. 1994).[9]  The party seeking a mistrial has the burden of

---

[9] For comparison, "[a] mistrial is granted in a case in which the jury is discharged without a verdict; a motion for new trial is made after a judgment has been rendered." *State v. Sanders*, No. M2011-00426-CCA-R3-CD, 2012 WL 5948885, at *4 (Tenn. Crim. App. Nov. 15, 2012) (quotation omitted).

We note that within the body of their brief on appeal, the defendants additionally argue that the trial judge should have granted their motion for *new trial* in which they challenged additional statements by counsel.  However, this was not listed as an issue presented for review in the designated section of their brief.  The issue they listed assigned error to the denial of their "Motion for a Mistrial."  Because the denial of their motion for *new trial* based on statements of counsel was not designated as an issue for

establishing the need for it. *Rodriguez v. Bridgestone/Firestone N. Am. Tire, LLC*, No. M2013-01970-COA-R3-CV, 2017 WL 4513569, at *5 (Tenn. Ct. App. Oct. 10, 2017). Whether to grant or deny a motion for a mistrial is within the sound discretion of the trial court. *Id.* at *5; *Russell v. Illinois Cent. R.R. Co.*, No. W2013-02453-COA-R3-CV, 2015 WL 4039982, at *22 (Tenn. Ct. App. June 30, 2015).

In addition, "trial courts have broad discretion to control closing arguments." *State v. Gentry*, 538 S.W.3d 413, 430 (Tenn. 2017) (citing *State v. Odom*, 336 S.W.3d 541, 559 (Tenn. 2011)). Generally, "control over the argument of counsel resides with the trial court, and the trial court has broad discretion as to what shall and shall not be permitted in argument." *Monypeny v. Kheiv*, No. W2014-00656-COA-R3-CV, 2015 WL 1541333, at *18 (Tenn. Ct. App. Apr. 1, 2015) (citing *Davis v. Hall*, 920 S.W.2d 213, 217 (Tenn. Ct. App. 1995)). Appellate courts will not interfere with a trial court's discretionary decision in refusing to grant a mistrial based on misconduct of counsel in argument "'unless the argument is clearly unwarranted and made purely for the purpose of appealing to passion, prejudices and sentiment which cannot be removed by sustaining the objection of opposing counsel.'" *Id.* (quoting *Davis*, 920 S.W.2d at 217). "Whether to give a curative instruction under the circumstances is a matter within the trial court's discretion." *Marshall v. Cintas Corp.*, 255 S.W.3d 60, 75 (Tenn. Ct. App. 2007).

Here, the trial court sustained the objection to the "send a message" argument, admonished Plaintiff's counsel, and gave a curative instruction, but it denied the motion for a mistrial upon finding that the defendants had not been "prejudiced to the point" that a curative instruction would not suffice. We conclude that denying the motion for mistrial but giving a curative instruction was within the range of reasonable alternatives under the circumstances, and we discern no abuse of discretion in the trial court's decision.

### D.  Motion for New Trial Based on Juror Misconduct

Next, we address the defendants' contention that the trial court committed reversible error by denying their motion for new trial based on juror misconduct. The defendants argue that a juror failed to disclose personal knowledge of critical facts of the case during voir dire or at any other time but disclosed that personal knowledge and his opinions to the other jurors during deliberations. Plaintiff argues that the defendants

---

review, it is waived. *See Hodge v. Craig*, 382 S.W.3d 325, 335 (Tenn. 2012) ("[A]n issue may be deemed waived when it is argued in the brief but is not designated as an issue in accordance with Tenn. R. App. P. 27(a)(4)."); *Augustin v. Bradley Cty. Sheriff's Office*, No. E2018-00281-COA-R3-CV, 2019 WL 4862240, at *4 (Tenn. Ct. App. Oct. 2, 2019) *perm. app. denied* (Tenn. Feb. 19, 2020) ("[I]ssues that are not properly designated are generally waived even when argued in the body of the brief."); *Hawkins v. Hart*, 86 S.W.3d 522, 531 (Tenn. Ct. App. 2001) ("Courts have consistently held that issues must be included in the Statement of Issues Presented for Review required by Tennessee Rules of Appellate Procedure 27(a)(4). An issue not included is not properly before the Court of Appeals.").

failed to submit any admissible evidence to support their claim of juror misconduct; therefore, the trial court did not abuse its discretion in denying the defendants' motion for new trial. Again, we agree with Plaintiff.

This Court reviews a trial court's denial of a motion for new trial for abuse of discretion. *Allen v. Albea*, 476 S.W.3d 366, 373 (Tenn. Ct. App. 2015). In order to grant a new trial due to jury misconduct, "there must be admissible evidence on the issue." *Id.* at 374 (quoting *Patton v. Rose*, 892 S.W.2d 410, 413 (Tenn. Ct. App. 1994)). "The party seeking a new trial on the ground of juror misconduct bears the burden of proving misconduct by a preponderance of the evidence." *Id.* at 376. Specifically, the party challenging the validity of a jury verdict "must produce admissible evidence to make an initial showing that the jury was exposed to extraneous prejudicial information or subjected to an improper outside influence." *State v. Adams*, 405 S.W.3d 641, 651 (Tenn. 2013).

Tennessee Rule of Evidence 606(b) "governs a juror's competency to testify regarding the validity of the verdict." *State v. Hobson*, No. M2002-01462-CCA-R3-CD, 2003 WL 22970968, at *16 (Tenn. Crim. App. Dec. 18, 2003). Stated differently, it "governs the taking of testimony of former jurors." *State v. Gaddis*, No. E2011-00003-CCA-R3-CD, 2012 WL 2370636, at *12 (Tenn. Crim. App. June 25, 2012). Rule 606(b) provides, in pertinent part:

> Upon an inquiry into the validity of a verdict [], a juror may not testify as to any matter or statement occurring during the course of the jury's deliberations or to the effect of anything upon any juror's mind or emotions as influencing that juror to assent to or dissent from the verdict [] or concerning the juror's mental processes, *except* that a juror may testify on the question of whether extraneous prejudicial information was improperly brought to the jury's attention, whether any outside influence was improperly brought to bear upon any juror, or whether the jurors agreed in advance to be bound by a quotient or gambling verdict without further discussion; nor may a juror's affidavit or evidence of any statement by the juror concerning a matter about which the juror would be precluded from testifying be received for these purposes.

Tenn. R. Evid. 606(b) (emphasis added). The Advisory Commission Comment to the Rule further explains,

> A juror may testify or submit an affidavit in connection with a motion for new trial, but only in the limited circumstances of:
>
> (1) "extraneous prejudicial information" finding its way into the jury room,
> (2) improper outside pressure on a juror, or

- 23 -

(3) a quotient or gambling verdict.

Tenn. R. Evid. 606(b) cmt. Simply put, this Rule "'bars juror testimony and affidavits concerning jury deliberations but permits testimony and affidavits pertaining to extraneous prejudicial information, outside influence, and agreed quotient verdicts.'" *State v. Malena*, No. W2008-01433-CCA-R3-CD, 2010 WL 2593672, at *17 (Tenn. Crim. App. June 28, 2010) (quoting *State v. Akins*, 867 S.W.2d 350, 355 (Tenn. Crim. App. 1993)).

In the case before us, the jury had already been excused when C.C. re-entered the courtroom and informed the trial judge about the statements made by another unnamed juror. Because the court reporter was still present, C.C.'s statements are reflected in the transcript of the hearing. However, she did not testify. The trial judge told C.C., "You may be asked questions later from these lawyers. I'm not going to develop that. I will let them talk to you if they want to later." At the end of her statement, the trial judge instructed the attorneys to "follow up if you would like to." The defendants subsequently filed a motion for new trial based on juror misconduct, but they did not submit any juror testimony or juror affidavit in support of their motion. Instead, the defendants submitted "a transcript of the statement that Ms. [C.C.] gave to [defense counsel's] private investigator." No one had spoken with the juror who allegedly made the improper statement during deliberations. Plaintiff's counsel objected to consideration of the private investigator's statement because it was a statement by the private investigator and not the juror herself, and the juror never swore or took an oath regarding the truth of her statement to the private investigator. The trial judge agreed. He said that the statement of the private investigator who spoke to the juror "would not be considered by this Court" because it was "hearsay and cannot serve as a basis to impeach the jury verdict."

The defendants do not challenge the exclusion of the private investigator's statement on appeal or even mention it in their brief. Instead, they cite to the portion of the trial transcript reflecting the unsworn statement made by Ms. C.C. after the jury was excused. This was not sufficient evidence to meet their burden. The party seeking a new trial on the ground of juror misconduct bears the burden of producing admissible evidence "proving misconduct by a preponderance of the evidence." *Allen*, 476 S.W.3d at 376. Pursuant to Rule 606(b), the defendants could have submitted juror testimony or affidavits in an attempt to demonstrate that extraneous prejudicial information found its way into the jury room. However, they submitted neither. As such, the trial court did not err in denying their motion for new trial based on juror misconduct. *See Gatlin v. State*, No. M2016-00824-CCA-R3-PC, 2017 WL 2713506, at *11 (Tenn. Crim. App. June 23, 2017) (concluding that a petitioner failed to produce any admissible evidence to make an initial showing that the jury was exposed to extraneous prejudicial information where the "editorial" written by the juror was not only "rank hearsay" inadmissible under Rule 801 but also inadmissible under Rule 606(b)); *Bachar v. Partin*, No. M2015-00724-COA-R3-CV, 2016 WL 3198362, at *4 n.5 (Tenn. Ct. App. May 27, 2016) (considering an

- 24 -

affidavit of an individual who interviewed jurors but concluding that notes from the interviews attached to the affidavit contained inadmissible hearsay); *see also Wilcher v. State*, 863 So. 2d 776, 828-29 (Miss. 2003) (concluding that an "unsworn statement" of a juror was insufficient evidence to support an allegation of juror misconduct).

## E. Remand

The final issue raised by the defendants on appeal was contingent on this Court reversing the trial court and ordering a new trial due to either juror misconduct or statements of counsel during closing argument. In the event of such a remand, the defendants asked this Court to consider whether they should be allowed to raise the affirmative defense of comparative fault during the retrial on remand. This issue is pretermitted, as we have affirmed the trial court's rulings on those issues.

## F. Remittitur

Finally, we reach the issue raised by Plaintiff on appeal. Plaintiff challenges the trial court's suggested remittitur of the jury verdict in every category of damages and asks this Court to reinstate the jury verdict. The Tennessee Supreme Court discussed the issue of remittitur at length in *Borne v. Celadon Trucking Servs., Inc.*, 532 S.W.3d 274, 308-10 (Tenn. 2017):

> Where a party invokes the right to a jury trial, our constitution requires "that the jury be allowed to determine all disputed issues of fact." *Spence v. Allstate Ins. Co.*, 883 S.W.2d 586, 594 (Tenn. 1994); *see also Meals* [*ex rel. Meals v. Ford Motor Company*], 417 S.W.3d [414, 419 (Tenn. 2013)] (citing Tenn. Const. art. I, § 6). The questions of disputed fact to be resolved by the jury include the type and amount of any damages awarded to the plaintiff. *Meals*, 417 S.W.3d at 419-20.
>
> However, "a verdict of a jury is subject to the supervision of the trial court." *Foster v. Amcon Int'l, Inc.*, 621 S.W.2d 142, 144 (Tenn. 1981). "No verdict is valid until it is approved by the trial court judge." *Davidson v. Lindsey*, 104 S.W.3d 483, 488 (Tenn. 2003) (citing *Cumberland Tel. & Tel. Co. v. Smithwick*, 112 Tenn. 463, 79 S.W. 803, 805 (1904)). In determining whether to approve the jury's verdict, the trial judge acts as a "thirteenth juror":
>
> > "The reasons given for the rule are, in substance, that the circuit judge hears the testimony, just as the jury does, sees the witnesses, and observes their demeanor upon the witness stand; that, by his training and experience in the weighing of testimony, and the application of legal rules thereto, he is especially qualified for the correction of any errors into which

the jury by inexperience may have fallen, whereby they have failed, in their verdict, to reach the justice and right of the case, under the testimony and the charge of the court; that, in our system, this is one of the functions the circuit judge possesses and should exercise—as it were, that of a thirteenth juror. So it is said that he must be satisfied, as well as the jury; that it is his duty to weigh the evidence; and, if he is dissatisfied with the verdict of the jury, he should set it aside."

*Davidson*, 104 S.W.3d at 488 (quoting *Smithwick*, 79 S.W. at 804). "The purpose of the thirteenth juror rule is to be a 'safeguard . . . against a miscarriage of justice by the jury.'" *State v. Moats*, 906 S.W.2d 431, 434 (Tenn. 1995) (quoting *State v. Johnson*, 692 S.W.2d 412, 415 (Tenn. 1985) (Drowota, J., dissenting)).

The trial judge must be independently satisfied with the verdict; if the trial judge is dissatisfied with the verdict, the verdict must be set aside. *Holden v. Rannick*, 682 S.W.2d 903, 905 (Tenn. 1984). . . .

"However, when the trial judge's dissatisfaction is only with the amount of the jury award, and not with the allocation of liability or fault, he or she may suggest an additur or remittitur." *Bonner v. Deyo*, No. W2014-00763-COA-R3-CV, 2014 WL 6873058, at *4 (Tenn. Ct. App. Dec. 5, 2014) (citing *Turner v. Jordan*, 957 S.W.2d 815, 824 (Tenn. 1997)). Suggesting an additur or a remittitur in lieu of granting a new trial "avoids the necessity of conducting a new trial with its added expense and delay." *Overstreet v. Shoney's, Inc.*, 4 S.W.3d 694, 718 (Tenn. Ct. App. 1999). To avoid contravention of the right to jury trial clauses of the federal and state constitutions, the trial court must obtain the consent of the party against whom the additur or remittitur is to be entered; if that party does not consent, the trial court must order a new trial. *Spence*, 883 S.W.2d at 594; *see also* Tenn. Code Ann. §§ 20-10-101, -102. It has long been recognized that "[t]he amount of the verdict is primarily for the jury to determine, and next to the jury the most competent person to pass upon the matter is the judge who presided at the trial and heard the evidence." *Reeves v. Catignani*, 157 Tenn. 173, 7 S.W.2d 38, 39 (1928).

"The power of a trial judge to disturb a verdict because of his dissatisfaction with the amount of damages rests in this state on more than a century of precedent and practice." *Foster*, 621 S.W.2d at 144. However, over time, the contours of the trial court's prerogative to suggest a remittitur or additur have evolved.

. . . .

The current remittitur statute, Tennessee Code Annotated section 20-10-102, sets forth the procedure for a trial court's suggestion of remittitur.

In doing so, it refers to the trial court's authority to suggest a remittitur "when the trial judge is of the opinion that the verdict in favor of a party should be reduced . . . ." Tenn. Code Ann. § 20-10-102(a). In 1987, the legislature added the following language to subsection (b) of that statute: "The court of appeals shall review the action of the trial court suggesting a remittitur using the standard of review provided for in T.R.A.P. 13(d) applicable to decisions of the trial court sitting without a jury." Tenn. Code Ann. § 20-10-102(b). The provision in Rule 13(d) of the Tennessee Rules of Appellate Procedure to which section 20-10-102(b) refers states: "[R]eview of findings of fact by the trial court in civil actions shall be de novo upon the record of the trial court, accompanied by a presumption of the correctness of the finding, unless the preponderance of the evidence is otherwise." Tenn. R. App. P. 13(d). Taken altogether, these indicate that the legislature intended for trial courts to have the authority to grant remittitur if the trial judge finds that the evidence preponderates in favor of a lower amount of damages than the jury awarded.

Thus, over time, trial courts have acquired broader authority to suggest a remittitur. A trial court is no longer required to find that the amount of a jury's verdict is so excessive as to indicate passion, prejudice, corruption, or caprice on the part of the jury. A trial judge may suggest an adjustment in a jury verdict even when the amount of the verdict is within the range of reasonableness, i.e., is supported by material evidence in the record. After seeing the witnesses and observing their demeanor, the trial court is "to independently weigh the evidence, pass upon the issues, and decide whether the verdict is supported by the evidence." *Moats*, 906 S.W.2d at 433. After making his own independent assessment of the witnesses' credibility, if the trial judge finds that the evidence preponderates in favor of a lower amount of damages, the trial judge may suggest remittitur instead of granting a new trial.

*Borne,* 532 S.W.3d at 308-10. As this passage indicates, "trial courts now have expanded authority to suggest remittitur based on the preponderance of the evidence." *Id.* at 313.

The *Borne* court further elaborated on the standard of review to be applied by appellate courts. "[U]nder section 20-10-102(b), the standard of appellate review for a *trial court's* suggestion of remittitur requires the appellate court to ascertain whether the trial judge's reduction of the jury award is supported by a preponderance of the evidence." *Id.* at 310. When appellate courts apply the preponderance of the evidence standard to review the suggested remittitur, we must "'giv[e] due credit to the jury's decision on the credibility of the witnesses and that of the trial judge in his capacity as thirteenth juror.'" *Id.* at 311 (quoting *Foster*, 621 S.W.2d at 145); *see also Bain v. Simpson*, No. M2001-00088-COA-R3-CV, 2002 WL 360320, at *2 (Tenn. Ct. App. Mar. 7, 2002) (noting that "remittitur is based on factual determinations"). In summary, "[t]his

Court reviews a trial court's determination of a remittitur *de novo* upon the record with a presumption of correctness of the trial court's findings unless the preponderance of the evidence is otherwise." *McLemore ex rel. McLemore v. Elizabethton Med. Inv'rs, Ltd. P'ship*, 389 S.W.3d 764, 794 (Tenn. Ct. App. 2012). For the evidence to preponderate against the trial court's finding, it must support another finding "with greater convincing effect." *Branch Banking & Tr. Co. v. Hill*, 582 S.W.3d 221, 229 (Tenn. Ct. App. 2019).

The *Borne* court also adopted a "three-prong framework for appellate review" of a suggested remittitur. *Borne*, 532 S.W.3d at 311.

> First, we examine the reasons for the trial court's action since adjustments are proper only when the court disagrees with the amount of the verdict. Second, we examine the amount of the suggested adjustment since adjustments that totally destroy the jury's verdict are impermissible. Third, we review the proof of damages to determine whether the evidence preponderates against the trial court's adjustment.

*Id.* (quoting *Long v. Mattingly*, 797 S.W.2d 889, 896 (Tenn. Ct. App. 1990)).

Before examining the specific categories of damages reduced in this case, we begin with the second prong of the framework above, which requires us to examine whether the suggested adjustment totally destroyed the jury's verdict. When applying the second prong, "Tennessee courts do not analyze award adjustments by the type of damages awarded," analyzing "each type of damages in a vacuum," but rather have "typically considered whether the *overall* verdict was destroyed by the additur or remittitur." *Bonner*, 2014 WL 6873058, at *8 (emphasis added); *see, e.g.*, *West v. Epiphany Salon & Day Spa, LLC*, No. E2016-01860-COA-R3-CV, 2017 WL 1502827, at *7 (Tenn. Ct. App. Apr. 25, 2017) (considering the overall reduction of the verdict by 61.8%); *Adams v. Leamon*, No. E2012-01520-COA-R3-CV, 2013 WL 6198306, at *5 (Tenn. Ct. App. Nov. 25, 2013) (reviewing the overall reduction percentage rather than the percentage for each category of damages). Here, the overall verdict was reduced by less than fifty percent, from $2.5 million to $1.3 million. "[T]here is no set mathematical formula or percentage to use," but courts should consider whether the adjustment resulted in an award "not only proportionally different from the jury verdict but also substantially different in absolute terms." *Borne*, 532 S.W.3d at 311. "A suggested remittitur should not be so substantial as to destroy the jury's verdict." *Meals*, 417 S.W.3d at 421 n.8. The trial court's adjustment by less than half was not so disproportionate as to totally destroy the jury's verdict.[10]

---

[10] In *Meals*, 417 S.W.3d at 421 n.8, our supreme court provided some guidance:

> There is no set percentage that represents the destruction of the jury's verdict. *See* [*Foster*, 621 S.W.2d at 148 n.9] ("[W]e do not intend to establish a numerical standard for reviewing additurs and remittiturs."); *Webb v. Canada*, No. E2006-01701-COA-R3-

Next, we turn to the remaining prongs: the reasons given by the trial judge and the proof of damages to determine the preponderance of the evidence. "[W]here there is an itemized verdict form, remittitur should be suggested as to particular itemized verdict amounts, because the jury has assigned a separate monetary loss for each type of damages requested and the proof as to each type of damages must be considered separately." *Johnson v. Nunis*, 383 S.W.3d 122, 134-35 (Tenn. Ct. App. 2012) (internal quotations omitted). The trial court in this case did just that. Thus, we will review the trial court's reasoning and the evidence presented with respect to its suggested remittitur of each category of damages.

### 1. Gardenia Parker's "Compensatory Damages"

The second question on the jury verdict form asked "what amount of compensatory damages in total, if any, did plaintiff Gardenia Parker prove she suffered as a result of defendants' actions or non-actions." The total written by jury for this category was $500,000. (A separate category addressed Gardenia's loss of consortium, which we will discuss later.)

The trial judge suggested a remittitur of Gardenia's compensatory damage award to $150,000. The first prong of the analysis requires us to consider the trial court's stated reasons for the adjustment to see if the trial court disagreed with the facts as found by the jury.[11] *Borne*, 532 S.W.3d at 311. Here, the trial judge discussed his reasoning during the hearing on the motion for remittitur and the second hearing on the motion to reconsider the remittitur and referenced those oral rulings in his orders. The trial judge stated that he approved the jury verdict as to liability and agreed that damages should be awarded. "However," he added, "as the 13th juror I do take a different view on the amount of damages[.]" Overall, the trial judge stated that the jury verdict was "excessive and above the range of reasonableness." He noted that Plaintiff did not submit any evidence of economic damages, as she only sought to recover for pain and suffering and loss of enjoyment of life. Regarding Gardenia's claim for compensatory damages,

CV, 2007 WL 1519536, at *4 (Tenn. Ct. App. May 25, 2007) ("While we decline to establish any particular percentage that would indicate a remittitur that has totally destroyed a jury verdict, we note that [large] remittiturs by percentage have been found acceptable by this Court and the Supreme Court of our state."). *Compare Webb*, 2007 WL 1519536, at *4 (citing cases in which remittiturs ranging from 40% to 59% were found to not destroy the jury's verdict), *with Guess v. Maury*, 726 S.W.2d 906, 913 (Tenn. Ct. App. 1986) (holding that 75% remittitur destroyed the verdict), *overruled on other grounds by Elliott*, 320 S.W.3d at 252, *and Myers v. Myers*, No. E2004-02135-COA-R3-CV, 2005 WL 1521952, at *1 (Tenn. Ct. App. June 27, 2005) (holding that 70% remittitur destroyed the verdict).

[11] "The trial court's explanation of its reasons for suggesting a remittitur need not be overly detailed in order to give the appellate court sufficient information to conduct appellate review of the remittitur decision." *Borne*, 532 S.W.3d at 314 at n.25.

- 29 -

specifically, the trial judge acknowledged that she was injured independently of her father but pointed out that "there were no medical bills offered for her injuries" and "no lost earnings." These were valid considerations. "[T]he factors and evidence to be considered in making an award of damages for pain and suffering include, in addition to the nature of the injury itself, the amount of medical expenses [and] the discomfort experienced in being treated." *In re Estate of Lehman*, No. M2011-01586-COA-R3-CV, 2012 WL 1925560, at *5 (Tenn. Ct. App. May 25, 2012). For instance, in *West*, 2017 WL 1502827, at *7, this Court affirmed a remittitur where the trial judge considered, among other things, the fact that "economic damages account[ed] for only around 7% of [the] jury verdict," stating that the trial court's reasoning was "sound." *See also Adams*, 2013 WL 6198306, at *4 (concluding that the evidence did not preponderate against the trial court's finding that over $275,000 was excessive for future pain and suffering and loss of enjoyment of life considering that medical expenses only amounted to around $15,000 and the plaintiff never missed work).

For the third prong, "we look at the proof to ascertain whether the evidence preponderates against the trial court's additur or remittitur." *Borne*, 532 S.W.3d at 311. "This prong requires the appellate court to evaluate the preponderance of the evidence, giving proper deference to both the jury and to the trial judge in his capacity as thirteenth juror." *Id.* at 312. Applying that standard, we conclude that the evidence supports the trial court's findings. As the trial court observed, Plaintiff did not submit any medical bills or other evidence of any economic damages. Gardenia suffered a dislocated arm and bite wounds that did not need stitches. She was treated and released that same day. She had not received any counseling and did not testify as to any lost wages. However, the evidence showed that Gardenia became withdrawn and sad after the incident and was still upset by memories of the scene.

As the Tennessee Supreme Court has recognized,

> Assigning a compensable, monetary value to non-economic damages can be difficult. The assessment of non-economic damages is not an exact science, nor is there a precise mathematical formula to apply in determining the amount of damages an injured party has incurred. Thus, a plaintiff is generally not required to prove the monetary value of non-economic damages.

*Meals*, 417 S.W.3d at 420 (internal quotations omitted). A plaintiff is entitled to recover compensatory damages for non-economic losses or injuries, which may include pain and suffering or loss of enjoyment of life. *Id.* "Damages for pain and suffering are awarded for the physical and mental suffering that accompany an injury." *Id.* "Pain and suffering" encompasses both physical and mental discomfort. *Overstreet*, 4 S.W.3d at 715. The wide array of mental and emotional responses that accompany the pain are characterized as suffering, including "anguish, distress, fear, humiliation, grief, shame, or

- 30 -

worry." *Id.* "Damages for loss of enjoyment of life compensate the injured person for the limitations placed on his or her ability to enjoy the pleasures and amenities of life." *Id.* at 715-16. Such damages relate to "daily life activities that are common to most people." *Id.* at 716.

Plaintiff rightly notes that these types of non-economic damages involve "'a subjective element not present in the determination of ordinary facts.'" *Borne*, 532 S.W.3d at 305 n.18 (quoting *Smartt v. NHC Healthcare/McMinnville, LLC*, No. M2007-02026-COA-R3-CV, 2009 WL 482475, at \*21 (Tenn. Ct. App. Feb. 24, 2009)). As noted in *Borne*, "[t]he jury trial guarantee requires that the subjective element involved be that of the community and not of judges." *Id.* "A jury has wide latitude in assessing non-economic damages. We trust jurors to use their personal experiences and sensibilities to value the intangible harms such as pain, suffering, and the inability to engage in normal activities." *Meals*, 417 S.W.3d at 425.

Still, "there must of necessity be some limit on damages allowed, and it is the duty of both the trial judge and the appellate courts to be certain that just limits are not exceeded." *Palanki ex rel. Palanki v. Vanderbilt Univ.*, 215 S.W.3d 380, 395 (Tenn. Ct. App. 2006) (affirming remittitur of an award of non-economic damages); *see also Duran v. Hyundai Motor Am., Inc.*, 271 S.W.3d 178, 211 (Tenn. Ct. App. 2008) (affirming remittitur of non-economic damages). "The trial judge, charged with ensuring a fair trial, serves as an important check on a jury's discretion to award damages." *Meals*, 417 S.W.3d at 420. "To determine whether a verdict is within the range of reasonableness, the trial judge must consider the credible proof at trial regarding the nature and extent of the injuries, pain and suffering, economic losses including past and future medical bills, lost wages and loss of earning capacity, age, and life expectancy." *Id.* at 421. "The trial court may consider the amount awarded in similar cases in determining whether a verdict is excessive." *Id.*

On appeal, Plaintiff argues that material evidence supported the jury verdict and that it was within the range of reasonableness. Notably, however, "[t]rial judges may suggest adjustments to a jury's verdict even if the verdict is within the range of reasonableness." *Meals*, 417 S.W.3d at 421. "A trial court's remittitur must be upheld unless the remittitur is contrary to the preponderance of the evidence." *Palanki*, 215 S.W.3d at 389 (citing *McCollum v. Huffstutter*, No. M2002-00051-COA-R3-CV, 2002 WL 31247077, at \*10 (Tenn. Ct. App. Oct. 8, 2002)).

Having carefully reviewed the record, we cannot say that the evidence preponderates against the trial court's decision to suggest a remittitur of the award of Gardenia's compensatory damages from $500,000 to $150,000. She suffered relatively minor physical injuries, with no permanent physical injuries, and she had not sought medical treatment since 2010. She did not testify to any lingering pain. She introduced no proof of economic damages. Although she has undoubtedly endured mental suffering

and grief since the incident, she had not sought counseling or received medication. Her injuries do not prevent her from engaging in normal life activities. Thus, the evidence does not preponderate against the trial court's suggestion of remittitur for Gardenia's "compensatory damages." *See, e.g.*, *Witherspoon v. Flowers*, No.1, 1991 WL 16670, at *1 (Tenn. Ct. App. Feb. 14, 1991) (finding a non-jury award of $7,500 to a dog bite victim was not excessive where the victim experienced continuing pain and $830 consisted of special damages); *McAbee v. Daniel*, 445 S.W.2d 917, 921, 926 (Tenn. Ct. App. 1968) (affirming a jury verdict of $5,000 to a minor child and $2,250 to her father for medical bills where a dog "bit a hole out of the cheek" of the child, requiring skin grafts and leaving a permanent scar, and the child often suffered nightmares from the attack); *Turner v. Duggin*, 532 S.W.3d 473, 482 (Tex. Ct. App. 2017) (affirming a jury verdict of $350,000 for future pain and suffering for the victim of a dog bite who underwent surgery, suffered necrosis of the calf, was forced to become sedentary, and had "life-long" problems and emotional distress as a result of the bite).

## 2.    Wrongful Death Damages

The third question listed on the jury verdict form asked the jury to "set out the damages that have been proven by a preponderance of the evidence for the death of William Parker." At this point, it is helpful to review the nature of a wrongful death action. "Wrongful death in Tennessee is a statutorily-created cause of action that both preserves any action belonging to the decedent and creates a separate action that belongs to the decedent's next-of-kin to compensate them for incidental damages suffered as a result of the decedent's death." *Meals*, 417 S.W.3d at 426 n.13 (citing Tenn. Code Ann. §§ 20-5-101 to -120 (2009 & Supp. 2012); *Jordan v. Baptist Three Rivers Hosp.*, 984 S.W.2d 593, 597-98 (Tenn. 1999)). "Damages under our wrongful death statute can be delineated into two distinct classifications." *Jordan*, 984 S.W.2d at 600. The first category of damages permits recovery for "injuries sustained by the deceased from the time of injury to the time of death," including "medical expenses, physical and mental pain and suffering, funeral expenses, lost wages, and loss of earning capacity." *Id.* The second category of damages permits recovery for "incidental damages suffered by the decedent's next of kin." *Id.* Such incidental damages include "the pecuniary value of the decedent's life." *Id.* "[T]he pecuniary value of a human life is a compound of many elements." *Id.*

"Factors to consider in determining the pecuniary value of the decedent's life include 'the expectancy of life, the age, condition of health and strength, capacity for labor and earning money through skill, any art, trade, profession and occupation or business, and personal habits as to sobriety and industry.'" *Knowles v. State*, 49 S.W.3d 330, 339 (Tenn. Ct. App. 2001) (quoting *Jordan*, 984 S.W.2d at 600). "Pecuniary value takes into account all aspects of a decedent's life, including his or her services and companionship, so as to place a value on the decedent's life." *Mercer v. Vanderbilt Univ., Inc.*, 134 S.W.3d 121, 132 (Tenn. 2004). As such, "consortium-type damages

- 32 -

suffered by the beneficiaries may be included as an element of the pecuniary value of the decedent[.]" *Beard v. Branson*, 528 S.W.3d 487, 498 (Tenn. 2017). In a wrongful death action, "a claim for consortium merely embodies one component of the decedent's pecuniary value of life." *Kline v. Eyrich*, 69 S.W.3d 197, 208 (Tenn. 2002).[12] "Pecuniary value also takes into account the decedent's probable living expenses had the decedent lived." *Jordan*, 984 S.W.2d at 600.

"Loss of consortium consists of several elements, encompassing not only tangible services provided by a family member, but also intangible benefits each family member receives from the continued existence of other family members," including "attention, guidance, care, protection, training, companionship, cooperation, affection, love, and in the case of a spouse, sexual relations." *Jordan*, 984 S.W.2d at 602. "Although an adult child is not automatically precluded from receiving parental consortium damages, the relationship between an adult child and the child's parent may be too attenuated in some cases to proffer sufficient evidence of consortium losses, and the adult child inquiry shall take into consideration factors such as closeness of the relationship and dependence." *In re Estate of Lehman*, 2012 WL 1925560, at *3.

In this case, the jury instructions explained that the jury could consider two categories of damages in a wrongful death action: (1) damages sustained by the injured party, including Mr. Parker's mental and physical suffering; and (2) "the present cash value of the pecuniary value of the life of the deceased," to be determined by considering various factors such as age, health, life expectancy, capacity for work, habits, and the reasonable value of the loss of consortium suffered by the wife and children of the deceased, minus expected living expenses had he survived. Thus, the jury instructions described how to value "the pecuniary value of the life of William Parker." The third question on the jury verdict form likewise asked the jury to "set out the damages that have been proven by a preponderance of the evidence for the death of William Parker." However, the blanks listed beneath that question were simply for "mental and physical suffering" endured by Mr. Parker and "loss of consortium." Despite the limited label on the verdict form for "loss of consortium," we presume that the jury followed the jury instructions and awarded damages for "the pecuniary value of the life of William Parker," as explicitly directed in the jury instructions. *See Rothstein v. Orange Grove Ctr., Inc.*, 60 S.W.3d 807, 814 (Tenn. 2001) ("We must [] presume that the jury followed the trial court's instructions.")

Neither party appears to dispute this conclusion. During the post-trial hearing at

---

[12] As previously noted, "The nature of a loss of consortium claim in Tennessee turns on the context in which it is asserted." *Igou*, 2015 WL 1517794, at *3 n.2. In a personal injury action, "loss of consortium is a distinct cause of action created by statute and held by the spouse of the injured party." *Id.* at *3. However, in the context of a wrongful death action, "loss of consortium is an element of damages awardable under the wrongful death statute as part of the pecuniary value of the decedent's life." *Id.* at *3 n.2.

which the trial court was asked to reconsider the remittitur, Plaintiff's counsel discussed "the second class of damages" and the jury instructions directing the jury to consider all of the various factors in making its award, such as age, health, life expectancy, etc. He said, "Those things all come into play for those consortium claims, and we're not really even questioning your remittitur of those things." Thus, Plaintiff recognized that the so-called "consortium" award on the verdict form was meant to reference the second class of damages. Likewise, on appeal, Plaintiff argues that "the jury faithfully and carefully followed the Court's instructions that required it to separate the 'two classes of damages,' which were 1) mental and physical suffering and 2) 'the present cash value of the pecuniary value of the life of the deceased.'" In asking us to reinstate the original verdict, Plaintiff argues that the verdict "shows a conscientious regard to Mr. Parker's age, life expectancy, and all the other factors that the jury *was* instructed to consider for loss of consortium damages." Thus, no one suggests that the jury award was strictly limited to "loss of consortium," in the technical sense, rather than the broader category of damages described in the jury instructions and available under the wrongful death statute.

When discussing the jury instructions and jury verdict form, the trial judge stated that a wrongful death claim was on behalf of all heirs and would not "parcel them out individually." However, he explained that it would assist him in exercising his authority to review the jury verdict as thirteenth juror if he itemized different categories of damages on the verdict form so that he could understand how the jury arrived at its figures, "as opposed to looking at one global figure." As such, the jury verdict form asked for the "[r]easonable value of the loss of consortium suffered by Bessie Parker" and the "[r]easonable value of the loss of consortium suffered by Gardenia Parker." According to the trial transcript, when the trial judge read the jury verdict from the verdict form, he announced that the jury awarded $500,000 for loss of consortium suffered by Bessie Parker and $500,000 for loss of consortium suffered by Gardenia Parker. Thus, the jury awarded a total of $1 million for "loss of consortium." The trial judge suggested remittitur of these amounts for a total "loss of consortium" award of $400,000. We now review the trial court's suggested remittitur of this category of damages using the framework above.

### a. Pecuniary Value of Life

The trial judge listed several factors he considered that led him to suggest a remittitur of the jury verdict. These included Mr. Parker's advanced age in his seventies, his "overall health," his habits, his work status, and his lack of employment income. The trial judge pointed out that Mr. Parker was unemployed and disabled. He found that Mr. Parker "had other health problems and challenges." The court also noted that Bessie "lived only a few years after Mr. William Parker's death." The court acknowledged the close bond between Gardenia and her father but nevertheless found the award "excessive and outside the range of reasonableness." These were all appropriate factors for consideration. *See Knowles*, 49 S.W.3d at 339 ("Factors to consider in determining the

- 34 -

pecuniary value of the decedent's life include the expectancy of life, the age, condition of health and strength, capacity for labor and earning money through skill, any art, trade, profession and occupation or business, and personal habits as to sobriety and industry.") (quotation omitted).

Again, considering the evidence in the record, we cannot say that the evidence preponderates against the trial court's suggested remittitur of this category of damages from $1 million to $400,000. Mr. Parker was in his seventies, disabled, and unemployed at his death. The evidence simply does not support Plaintiff's argument on appeal that Mr. Parker was "active and in excellent health." Although he walked everywhere he went because he did not have a car, his own wife described him in a word as "sickly." She said he had to stop working due to "real bad" high blood pressure. He was receiving disability benefits but in an unspecified amount. There was also no expert testimony regarding the pecuniary value of his life. By all accounts, Mr. Parker had a very close relationship with his wife and his daughter. However, Bessie died five years after Mr. Parker. Gardenia was an adult at the time of his death and no longer dependent on her father. The evidence simply does not preponderate against the trial court's suggested reduction of the $1 million jury verdict for this class of damages.[13] *See, e.g.*, *McLemore*, 389 S.W.3d at 775-76, 794 (affirming remittitur of wrongful death loss of consortium award from $100,000 to $50,000).

### b.    Mr. Parker's Pain and Suffering

The final damage award we review is for Mr. Parker's pain and suffering. As we explained earlier in this opinion, the other category of damages available under the wrongful death statute is for "injuries sustained by the deceased from the time of injury to the time of death," including "medical expenses, physical and mental pain and suffering, funeral expenses, lost wages, and loss of earning capacity." *Jordan*, 984 S.W.2d at 600. Here, no proof was offered regarding medical expenses, funeral expenses, lost wages, or loss of earning capacity. As such, the verdict form only listed "Mental and physical suffering endured by William Parker between injury and death." For this category, the jury awarded $1 million.

The trial court again found the jury's award excessive and suggested remittitur to $750,000. The trial judge pointed out that Mr. Parker had no economic damages – no funeral bills, no lost earnings, and no medical bills. The trial judge acknowledged that his pain and suffering from the time of injury to death "was nothing short of tremendous," being attacked by two pit bulls, but at the same time, it pointed out that he

---

[13] We also note that our conclusion would be the same even if we utilized the figures erroneously recited in the trial court's order of judgment. The judgment mistakenly recited that the jury awarded $250,000 for each "loss of consortium" award, for a total of $500,000 in "loss of consortium" damages. Utilizing these figures would mean that the trial court reduced this category of damages from $500,000 to $400,000. We would affirm the suggestion of remitter using these figures as well.

"died on the scene after this attack by the dogs." For those reasons, the trial judge suggested reducing the award to $750,000 "from injury to death." At the hearing at which the trial judge was asked to reconsider the suggestion of remittitur, the trial judge again reiterated that "he died on the scene." The trial judge stated that he did not take his decision regarding remittitur lightly and added, "I don't want you to think or anybody to think that I am minimizing what Mr. Parker went through or his life. I based it upon the evidence that I heard."

Having carefully considered the evidence, once again, we do not find that it preponderates against the reduction suggested by the trial judge. Factors "to be considered in making an award of damages for pain and suffering include, in addition to the nature of the injury itself, the amount of medical expenses, the discomfort experienced in being treated and *the length of time between injury and death*." *In re Estate of Lehman*, 2012 WL 1925560, at *5 (emphasis added). With respect to this class of damages, "a wrongful death plaintiff may not recover damages for pain and suffering absent proof of conscious injury." *Knowles*, 49 S.W.3d at 339. The pain and suffering endured by Mr. Parker during his last moments was undoubtedly horrific. However, the length of time between his injury and death was quite short. Kenosha Blue, Gardenia's cousin, testified that after Mr. Parker left to walk to the store, "not more than five minutes passed and a gentleman came knocking on the door telling us that he was attacked by pit bulls." Ms. Blue testified that she and Gardenia urgently ran out the door to find him, and they found Mr. Parker "[n]o farther than just a couple of blocks down, probably like five minutes, maybe three minutes away from the apartments." She added, "They stay right there at the corner that the apartments was on. All you had to do was just walk down the street." Ms. Blue testified that Mr. Parker "was not alive" at the point in time when she and Gardenia arrived at the field and saw him lying on the ground. Gardenia, on the other hand, testified that when she reached Mr. Parker, "[h]is breath was really, really, really, really light," and he took his last breath in her arms. Either way, although Mr. Parker's pain and suffering was undoubtedly tremendous, it was of a relatively short duration. Considering the nature of the injury, the lack of any medical expenses, and the length of time between injury and death, we cannot say that the evidence preponderates against the reduction in the pain and suffering award from $1 million to $750,000.[14]

In an attempt to demonstrate a "range of reasonableness," Plaintiff argues on

---

[14] We again note that we would reach the same conclusion if we utilized the erroneous figure listed in the trial court's judgment, which stated that the jury had awarded $1.5 million for Mr. Parker's pain and suffering.

We also note that the trial judge made a remark during the hearing on the motion to reconsider the suggestion of remittitur about "how very different this case could have been if comparative fault was allowed into the case." However, the trial judge clarified that this statement was dicta and "simply an observation," and he said it did not play any part in his original decision to suggest a remittitur or in his decision to deny the motion to reconsider that day. As such, we do not review that statement as a basis for the trial court's remittitur.

- 36 -

appeal that we should compare this case to the jury verdict awarded in *Smartt v. NHC Healthcare/McMinnville, LLC*, No. M2007-02026-COA-R3-CV, 2009 WL 482475, at *1 (Tenn. Ct. App. Feb. 24, 2009), a negligence and medical malpractice case against a nursing home and related entities for injuries sustained at the nursing home and for the patient's death. In *Smartt*, the jury returned a verdict of $450,000 for pain and suffering on the negligence claim and $2,000,000 for pain and suffering on the malpractice claim. *Id.* at *2 n.3. The decedent was around 88 years old and resided at the nursing home for over a year, where he was subjected to "continuous and enduring" mistreatment. *Id.* at *3, 25. Notably, the trial judge in *Smartt* approved the jury verdict, *id.* at *20, unlike in this case, where the trial judge suggested remittitur. This changes the standard of review on appeal. *See Smartt*, 2009 WL 482475, at *20 ("Appellate review of a compensatory damage award approved by the trial court involves a determination into whether there is any material evidence to support the verdict."). In *Smartt*, we acknowledged that the award was "high" but affirmed it after acknowledging the "substantial deference" given to jury verdicts approved by the trial court. *Id.* at *24, *20. "It matters not a whit where the weight or preponderance of the evidence lies under a material evidence review." *Meals*, 417 S.W.3d at 423. As our supreme court observed in *Meals*, a trial court's suggestion of remittitur "presents a different standard of review for the appellate courts than a case where the trial court affirmed the verdict as the thirteenth juror." *Id.* at 427. "Where the trial court has granted a motion for remittitur, appellate courts review the court's decision under the standard of review set forth in Tennessee Rule of [Appellate] Procedure 13(d), presuming the court's finding to be correct unless the evidence preponderates otherwise." *Watson v. Payne*, 359 S.W.3d 166, 170 (Tenn. Ct. App. 2011).

Plaintiff also suggests comparing the jury verdict to that in *Hatfield v. Allenbrooke Nursing & Rehab. Ctr., LLC*, No. W2017-00957-COA-R3-CV, 2018 WL 3740565, at *44 (Tenn. Ct. App. Aug. 6, 2018) *perm. app. denied* (Tenn. Jan. 17, 2019), in which the jury awarded $510,000 for pain and suffering. *Hatfield* also involved a nursing home patient, whose wounds progressed over a period of months to the point that she needed amputation. *Id.* at *47. Again, the trial judge approved the verdict in that case, denying the request for a remittitur. *Id.* at *46.

Finally, Plaintiffs suggests comparison with *Duran*, 271 S.W.3d at 186-87, where a woman suffered second and third degree burns requiring compression bandages for eighteen months and suffered "even more serious, long-term inhalation injury" causing her lung tissue to "die off." She required daily use of medication and inhalers and constant use of an oxygen machine. *Id.* A jury awarded her $2.8 million in non-economic damages, including $500,000 for past pain and suffering and $1,150,000 for future pain and suffering. *Id.* at 209. We affirmed the trial court's remittitur to $1.95 million in non-economic damages. *Id.* at 211.

"Our review of verdicts in similar cases must be approached with some caution. . .

- 37 -

. [W]e must take care to only consider cases that are 'similar'—presumably involving a similar plaintiff with similar injuries." *Meals*, 417 S.W.3d at 425-26. The cases cited by Plaintiff are not sufficiently comparable to aid our analysis. In fact, in *Smartt*, this Court distinguished the facts before it from cases in which damages stemmed "from a specific incident" such as an accident or operation, emphasizing that the patient's suffering "was continuous and enduring" and "affected the quality of the life he lived over the last sixteen months of his life[.]" *Id.* at *25.

The most factually comparable Tennessee case we have reviewed is *Chase v. City of Memphis*, 971 S.W.2d 380, 382 (Tenn. 1998), in which a woman was "mauled to death by two pit bull dogs" in Memphis. The procedural history of the case recites that "[her] estate received a judgment in the amount of $1,897,713.03 for her wrongful death." *Id.* at 383. However, the amount of the judgment was not challenged on appeal, and the appellate court's discussion only addressed the city's immunity. *Id.* The opinion does not reveal any information about the victim or what categories of damages were encompassed by the award. As such, we can discern little guidance from *Chase*.

Although it is not factually similar by involving dogs, we find some guidance in *Patterson ex rel. Patterson v. Dunn*, No. 02A01-9710-CV-00256, 1999 WL 398083 (Tenn. Ct. App. June 16, 1999), due to the nature of the decedent's injuries and death. *Patterson* was a tragic case involving a multi-car accident that caused a sand truck to flip over and land on the victim's vehicle, burying her vehicle in sand and asphyxiating her within a matter of minutes. *Id.* at *1. A witness to the accident testified that when he arrived at the vehicle, all he could see of the victim was her right arm protruding from the sand, but he held her hand and talked to her and "remembered her squeezing his hand several times until her grip finally faded." *Id.* at *2. As in this case, the victim "was conscious for several minutes and endured substantial pain and suffering during that time, but [] her death came relatively quickly." *Id.* at *14. In the wrongful death suit, the jury awarded a total verdict of $625,045 (with approximately $265,000 of that amount representing lost wages, lost earning capacity, and funeral expenses). *Id.* The defendants argued that this sum was excessive when the victim endured pain and suffering for no more than a few minutes. *Id.* at *12. However, the trial judge had approved the jury verdict, and the Court of Appeals reviewed it under the material evidence standard. *Id.* at *13. The Court of Appeals found the verdict "quite high considering the proof presented at trial" and "on the high end of the range of reasonableness." *Id.* at *14. However, being "mindful of the trial judge's role as thirteenth juror in his approval of the jury's award," this Court affirmed the verdict.[15] *Id.*

---

[15] *See also Matheny v. Tenn. Valley Auth.*, 523 F. Supp. 2d 697, 728 (M.D. Tenn.) *rev'd in part* 557 F.3d 311 (6th Cir. 2009) (awarding $75,000, after a bench trial on a wrongful death claim, for conscious pain and suffering by a drowning victim who "undoubtedly experienced excruciating pain and terror as he struggled to stay afloat and to breathe" but only for a period of ten minutes); *Sharpe v. City of Lewisburg, Tenn.*, 677 F. Supp. 1362, 1365 (M.D. Tenn. 1988) (finding a jury's award of $100,000 for pain and suffering excessive when the victim was shot eight times, still conscious when placed in the

Ultimately, "courts should be mindful that when looking at other jury verdicts, each case must be judged on its own particular facts." *Meals*, 417 S.W.3d at 426. Considering the trial court's stated reasons for its suggestion of remittitur in addition to the proof in the record, we conclude that the evidence does not preponderate against the reduced verdict and therefore affirm the trial court on this issue.

## V. CONCLUSION

For the aforementioned reasons, the decision of the circuit court is hereby affirmed and remanded. Costs of this appeal are equally taxed one-half to the appellants, Epstein Enterprises, LLC, and Longview Heights Partners, and one-half to the appellee, Gardenia Parker, for which execution may issue if necessary.

_s/ Carma Dennis McGee_
CARMA DENNIS MCGEE, JUDGE

---

ambulance, but dead on arrival at the hospital, as he "could not have lived more than a few minutes from the time of injury until death"); *Rothstein v. Orange Grove Ctr., Inc.*, No. E1999-00900-COA-R3-CV, 2000 WL 682648, at *4 (Tenn. Ct. App. May 25, 2000)*, aff'd in part, rev'd in part*, 60 S.W.3d 807 (Tenn. 2001) (affirming remittitur of jury verdict for pain and suffering from $275,000 to $200,000 where the decedent died from bacterial meningitis, the onset of which was likely 36-72 hours before death); *but see Champion v. Outlook Nashville, Inc.*, 380 F.3d 893, 905-06 (6th Cir. 2004) (finding sufficient evidence to support a jury verdict of $900,000 for pain and suffering of a nonverbal autistic individual during a seventeen-minute struggle with police before he died of asphyxiation, where the trial court denied a motion for remittitur and approved the verdict, requiring a "highly deferential" standard of review).